## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **LISA KWESELL; CHRISTINE TURECEK; AND JASON SCHWARTZ**, **individually and on behalf all others similarly situated,** | : : : : : | |
| | : | **CIVIL ACTION NO. :** |
| **Plaintiffs,** | : | |
| | : | **3:19-cv-01098 (KAD)** |
| **v.** | : | |
| | : | **CLASS ACTION** |
| **YALE UNIVERSITY,** | : | |
| | : | |
| **Defendant.** | : | **October 17, 2019** |

## FIRST AMENDED COMPLAINT

### INTRODUCTION

1.      This is a class action brought on behalf of all current and former employees of Yale University ("Yale") who are or were required to participate in Yale's Health Expectation Program ("HEP" or the "Program") or pay a fine adding up to $1,300 annually  between January 1, 2017 and present (the "Class").

2.       Yale's HEP is an employee wellness program. In recent years, the market for employee wellness programs has exploded, with the wellness vendor industry valued at approximately $8 billion. Wellness programs are now commonplace, especially among large employers.

3.      The rapid expansion in employee wellness programs has come at a price for employees, however. A contingent of employers has imposed financial penalties on employees who do not participate in these programs, despite growing evidence that imposing penalties does

not improve programs' effectiveness.[1] In some cases, the financial penalties can be steep. According to the Kaiser Family Foundation 2018 Employee Benefits Survey, nearly 5% of large employers impose fines for non-participation that exceed $1,000 per year.

4.      Yale falls within the 5% of employers that imposes an unusually punitive program—and on professional and technically staff with modest incomes. Its penalty for non-participation in the Program is among the highest in the country among large employers, coming in at $25 per week, or $1,300 per year. In New Haven, Connecticut, where Yale is located, $1,300 is equivalent to the median cost of nearly five and half weeks' worth of food, nearly a month's worth of housing, or a month's worth of childcare. More broadly, in the United States as a whole, nearly half of Americans cannot afford an unexpected $400 expense, let alone a $1,300 pay cut.[2]

5.      Yale's $1,300 fine, which Yale deducts directly from employees' paychecks in $25 weekly increments, places Yale employees who are subject to the HEP in an untenable position: either divulge protected information (including prior insurance claims data) and submit to invasive medical examinations and testing, or forfeit a substantial portion of their salary to keep their personal medical and genetic information private.

6.      Yale's $1,300 fine not only slashes employees' expected income; it violates their civil rights. The Americans with Disabilities Act ("ADA") and the Genetic Information Nondiscrimination Act ("GINA") prohibit employers from extracting medical or genetic information from employees unless that information is provided voluntarily.

---

[1] *See, e.g.*, *How Well Do Workplace Wellness Programs Work?*, Julie Appleby, National Public Radio (April 16, 2019), https://www.npr.org/sections/health-shots/2019/04/16/713902890/how-well-do-workplace-wellness-programs-work.
[2] Jeanna Smialek, *Many Adults Would Struggle to Find $400, the Fed Finds*, The New York Times (2019), https://www.nytimes.com/2019/05/23/business/economy/fed-400-dollar-survey.html.

7.      Many Yale employees subject to the HEP, however, aver that the program creates anything but a free choice. Jason Schwartz, a member of Local 35 UNITE HERE ("Local 35"), one of the unions at Yale that is subject to the HEP, contends that Yale is "forcing" union members to do "something they don't want to do" and "financially penalizing them if [they] don't do it." Ralph Marguy, another member of Local 35, explains that he would prefer not to participate but "can't throw away $25 [per week] to keep [his] information private."

8.      Statements from those subject to the HEP illustrate the serious impact of the involuntary examinations and medical and genetic inquiries Yale's Program imposes on employees. The weekly penalty imposed by Yale has a coercive effect on its employees, forcing them to either pay a fine to protect their civil rights or participate in a wellness program against their will. That is a violation of the ADA and GINA.

## JURISDICTION AND VENUE

9.      Because Plaintiffs Lisa Kwesell, Christine Turecek, and Jason Schwartz (collectively "Plaintiffs") bring this case under the ADA, 42 U.S.C. §§ 12101 et seq., and GINA, Pub. L. No. 110-233, 122 Stat. 881, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1) because Yale is located in this District and the events giving rise to the claim occurred in this District.

## PARTIES

11.     Named Plaintiff Lisa Kwesell is a member of Local 34 UNITE HERE ("Local 34"). She is a 56-year-old part-time service assistant at Yale. She makes approximately $25,600 per year. Her take-home pay after deductions and taxes is, on average, $352 per week. Lisa and her spouse, Patrick Rowland, are compliant with the HEP.

3

12.     Named Plaintiff Christine Turecek is a member of Local 35. She is a 57-year-old first cook at Yale. Christine is compliant with the HEP.

13.     Named Plaintiff Jason Schwartz is a member of Local 35. He is a 46-year-old locksmith at Yale. Jason is not compliant with the HEP, but his wife, Joyce Schwartz, is currently in compliance.

14.     Yale is the Plaintiffs' employer.

15.     Founded in 1701, Yale is a private academic institution located in New Haven, Connecticut. Yale offers an array of undergraduate and graduate degrees and employs over 4,700 faculty members and thousands of staff. In 2018, Yale reported total net assets of $32 billion.

## BACKGROUND

### I.     Employee Wellness Programs

16.     Employee wellness programs, also known as employee health programs, health screening programs, or health promotion programs, are commonplace among large employers (those employing more than 200 people) that offer health benefits. These programs engage with many different aspects of employee health care, from questionnaires, to lifestyle coaching, to smoking cessation classes and programs, to game-ified reward programs for reaching certain health targets.

17.     As of 2018, approximately 50% of large employers had deployed employee wellness programs that include a health risk assessment ("HRA")—typically an extensive medical questionnaire—and biometric testing, such as tests of blood pressure, cholesterol, and blood sugar, for both workers and their spouses.[3] Of those companies, only about a third

---

[3] Kaiser Family Foundation 2018 Employee Benefits Survey, Section 12: Health and Wellness Programs, https://www.kff.org/report-section/2018-employer-health-benefits-survey-section-12-health-and-wellness-programs/.

imposed <u>any</u> financial penalty for non-participation, and only about 9.5% imposed a penalty over $1,000 annually. In sum, as of 2018, fewer than 5% of <u>all</u> large employers nationwide had a wellness program that assessed penalties in excess of $1,000 on employees who did not submit to HRAs and medical tests.

18.     Employee wellness programs are subject to several different legal restrictions, including design requirements and restrictions under the Patient Protection and Affordable Care Act ("ACA"), Pub. L. No. 111-148, 124 Stat. 119. To the extent that wellness programs solicit confidential medical and genetic information, all of the inquiries or examinations must be "voluntary" under applicable civil rights laws, i.e., the ADA and GINA.

## II.     The ADA's "Voluntary" Requirement for Employee Wellness Programs

19.     Enacted in 1990, the ADA aims to combat workplace stigma and discrimination against individuals with disabilities. H.R. Rep. No. 101-485, pt. 2, at 75-76 (describing "blatant and subtle stigma" in the workplace against persons with disabilities and describing the harm inherent in the disclosure of medical conditions).

20.     Under the ADA, an employer is prohibited from "requir[ing] a medical examination" or "mak[ing] inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

21.     The ADA, however, permits a narrow exception to this general prohibition against non-job-related medical examinations and inquiries. Employers may make medical inquiries and conduct medical examinations as part of an employee wellness program, so long as those inquiries and examinations are "<u>voluntary</u>." *Id.* § 12112(d)(4)(B) (emphasis added). Any

non-voluntary inquiry or examination is, in itself, an act of discrimination under the ADA. *Id.* § 12112(d)(1).

22.     In 2000, the EEOC promulgated ADA enforcement guidance providing that "[a] wellness program is 'voluntary' as long as an employer neither requires participation nor penalizes employees who do not participate." *EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (ADA), General Principles*, Question 22 (July 27, 2000), https://www.eeoc. gov/policy/docs/ guidance-inquiries.html#10 ("2000 ADA Guidance").

## III.    GINA's "Voluntary" Requirement and Nondisclosure Requirement for Employee Wellness Programs

23.     In 2008, Congress enacted GINA to combat workplace discrimination based on the genetic information of an employee or his or her family members. As Congress emphasized there is a "compelling public interest in relieving the fear of discrimination and in prohibiting its actual practice in employment and health insurance." H.R. Rep. No. 110-28, pt. 3, at 2-3.

24.     Under GINA, "genetic information" includes both information about an employee's genetic tests and those of an employee's "family members" and information about "the manifestation of a disease or disorder in family members," also known as family medical history. 42 U.S.C. § 2000ff(4).

25.     To protect employees from discrimination, GINA forbids employers "to request, require, or purchase genetic information with respect to" an employee or his or her family members. *Id.* § 2000ff–1(b). GINA defines "family members" as dependents under the Employee Retirement Income Security Act of 1974 ("ERISA"), or those related (up to four degrees) to the employee or dependent. This includes those related through "marriage, birth, or adoption or placement for adoption." Thus, GINA protects from disclosure the medical histories

6

of employees and their family members, regardless of whether those family members are blood relatives.

26.     Like the ADA, GINA has a narrow carve-out for the collection of genetic information through an employee wellness program. Under GINA, an employer can request genetic information about an employee or his or her family members when "health or genetic services are offered by the employer, including such services offered as part of a wellness program," but only if "the employee provides prior, knowing, <u>voluntary</u> and written authorization." *Id.* (emphasis added).

27.     In 2010, the EEOC promulgated regulations implementing GINA. The 2010 GINA Rule forbade employers from exacting any penalties—or applying any incentives—that are conditioned on providing genetic information. 75 Fed. Reg. at 68,912; 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010).

28.     Thus, the 2010 GINA Rule expressly forbade any penalties/incentives attached to collecting any statutorily-protected genetic information through an employee wellness program, including spousal medical history. 29 C.F.R. § 1635.8(b)(2)(i)(A) (2010).

29.     The GINA regulations also prohibit employers from <u>disclosing</u> genetic information—regardless of how it is collected—with only very limited exceptions, such as consent or court order. 29 C.F.R. § 1635.9.

**IV.     2016 EEOC Regulations Governing Employee Wellness Programs under the ADA and GINA**

30.     In 2016, the EEOC promulgated new regulations governing employee wellness programs' compliance with the ADA and GINA (the "2016 Rules"). EEOC, Amendment to Regulations Under the Americans With Disabilities Act, Proposed Rule, 80 Fed. Reg. 21,659

(Apr. 20, 2015); EEOC, Genetic Information Nondiscrimination Act of 2008, Proposed Rule, 80 Fed. Reg. 66,853 (Oct. 30, 2015).

31.     The 2016 Rules set up a comprehensive framework for addressing wellness program compliance with the ADA and GINA, including protections against using collected information to discriminate, confidentiality instructions, and an explanation of why the ADA's "insurance safe harbor"—a provision excluding underwriting activities from the statute's coverage—does not entirely insulate wellness programs from the ADA's protective ambit.

32.     One of the most significant features of the 2016 Rules was the redefining of voluntary participation in an employee wellness program. The EEOC abandoned its longstanding position and expressly permitted employers to impose financial penalties for non-participation in a wellness program without rendering the wellness program involuntary.

33.     Specifically, the 2016 ADA Rule established that exams and inquiries in wellness programs were "voluntary" so long as the "incentive available under the program . . . does not exceed . . . thirty percent of the total cost of [individual] coverage." 29 C.F.R. § 1630.14(d)(3) (2016). In other words, so long as the financial penalty imposed by the employer did not exceed 30% of the insurance premium an individual would pay, the financial penalty did not render participation in the program involuntary.

34.     The EEOC also revised the GINA rules on voluntariness and allowed the imposition of financial penalties in the context of spousal medical histories. Under the 2016 GINA Rule, employers could penalize employees for refusing to provide spousal medical histories through HRAs in employee wellness programs without rendering the wellness program involuntary so long as the penalty did not exceed 30% of the total cost of individual health coverage. 29 C.F.R. § 1635.8(b)(2)(iii) (providing that an employer "may offer an inducement to

an employee whose spouse provides information about the spouse's manifestation of disease or disorder as part of a health risk assessment").

## V. Court Vacatur of the Penalty and Incentive Provisions of the 2016 EEOC Rules as Arbitrary and Capricious

35.     In 2017, the U.S. District Court for the District of Columbia vacated the penalty/incentive provisions of the 2016 Rules as arbitrary and capricious.[4] The court held that the EEOC had not "considered <u>any</u> factors relevant to the financial and economic impact the rule is likely to have on individuals who will be affected by the rule." The court specifically noted that the average 30% penalty—approximately $1,800 per year—"is the equivalent of several months' worth of food for the average family, two months of childcare in most states, and roughly two months' rent."[5]

36.     On December 20, 2018, consistent with the court's order, the EEOC withdrew the "incentive" portions of the 2016 Rules.

37.     The remaining portions of the 2016 Rules, including the EEOC's "safe harbor" interpretation, remain in effect. The statutory "voluntary" provisions and the agency's prior guidance and regulations, including the 2000 ADA Rule and the 2010 GINA Rule on voluntariness, also remain in place.

## SUBSTANTIVE ALLEGATIONS

## I. Yale's Health Expectation Program for Local 34 and Local 35

38.     On or around January 21, 2017, Yale entered into new collective bargaining agreements ("CBAs") with two Yale unions, Local 34 and Local 35. Local 34 represents almost

---

[4] *AARP v. EEOC*, 292 F. Supp. 3d 238, 240 (D.D.C. 2017), *amending judgment in opinion at* 267 F. Supp. 3d 14 (D.D.C. 2017) (emphasis in original).
[5] *Id.* at 32.

4,000 clerical and technical workers. Local 35 represents approximately 1,400 cafeteria, maintenance, and physical plant workers.

39.     The CBAs provided for the implementation of a new employee wellness program, the HEP, purportedly designed to "improve the health of Staff Members and spouses covered by the University's health plans."  The HEP applies to current Yale employees in Local 34 and Local 35, as well as persons under 65 who retired from Yale after January 21, 2017, and were members of either Local 34 or Local 35.

40.     Several union members have indicated that they did not know that the HEP was part of the CBA before it went into effect, that they were unaware that there was a penalty associated with the HEP, and/or that they argued to union leadership that they did not want to accept the Program or its fine.

## II.     Mandatory Examinations, Burdensome Health Coaching, and Reporting Required to Comply with the HEP

41.     Under the terms of the HEP, union members and their spouses must adhere to a strict schedule of examinations, testing and vaccination that individuals typically plan and carry out privately, in consultation with their doctors. Such procedures and examinations include mammograms, colonoscopies, and blood testing. The full testing, examination, and vaccination requirements of the HEP are reproduced in the table below:

The opt-out fee will not apply to bargaining unit employees who have retired prior to January 21,2017, or their covered spouses. These employees and their spouses will, however, be eligible and encouraged to participate in the Program.

## Health Care Requirements

| Healthcare Services | Age 21 – 29 | 30 – 39 | 40 – 49 | 50 – 64 | 65+ |
|---|---|---|---|---|---|
| Primary Care Visit with PCP | WITHIN ONE YEAR OF ENROLLMENT (after 1/1/2017) AND WITHIN PAST 3 YEARS | | WITHIN ONE YEAR OF ENROLLMENT (after 1/1/2017) AND WITHIN PAST 2 YEARS | | |
| Cholesterol Screening (Lipid) | | | LIPID PANEL WITHIN PAST 5 YEARS | | |
| Diabetes Screening (Glucose) | | | FASTING BLOOD GLUCOSE OR HEMOGLOBIN A1C OR GLUCOSE TOLERANCE TEST WITHIN PAST 5 YEARS | | |
| Breast Cancer Screening (Mammogram) | | | | WITHIN PAST 2 YEARS | |
| Cervical Cancer Screening (PAP Smear) | WITHIN PAST 3 YEARS | • WITHIN PAST 3 YEARS WITHOUT DOCUMENTED HPV NEGATIVE STATUS  • WITHIN PAST 5 YEARS WITH DOCUMENTED HPV NEGATIVE STATUS | | | |
| Colorectal Cancer Screening | | | | COLONOSCOPY WITHIN PAST 10 YEARS OR FIT/FOBT WITHIN PAST 1 YEAR | |
| Pneumococcal Vaccine | | | | | AT LEAST ONCE AFTER AGE 65 |

Note: A clinician may recommend additional screening tests and medical interventions to a patient, not subject to the opt-out fee.

42. On information and belief, union members and their spouses had until September or October, 2018, to complete any medical screenings, procedures, vaccinations, or examinations required to comply with the HEP. If union members or their spouses had already completed the required screenings within the timelines listed in the above chart, they could submit a Health Action Credit Form to receive credit for those health actions.[6] Those that failed to undergo the required health actions or failed to submit a completed Health Action Credit Form by September or October, 2018, were considered out of compliance with the Program and fined $25 per week going forward. (*See infra* Parts IV and V.)

---

[6] As described in Paragraph 52 *infra*, the Health Action Credit Form also contains a HIPAA waiver.

43.     In addition to burdensome medical examinations, some HEP participants are also required to consult with a health coach. As discussed in Part III, *infra*, Yale's wellness vendors assign health coaches based on information gleaned from the health insurance claims data of HEP participants. Yale mandates that employees and/or their spouses work with a health coach if they have both (1) certain risk variables, such as gaps in care, multiple chronic conditions, co-morbid conditions, and lab values out of range, and (2) a diagnosis of diabetes, heart disease, hyperlipidemia, chronic obtrusive pulmonary disease, heart failure, or hypertension.

44.     Employees and/or their spouses must consult with a health coach for a minimum of three hours per year. Appointments range from thirty minutes to one hour and occur in person or over the phone, although the length of the appointments can vary depending on the health issues the health coach is addressing. Employees often must use sick or vacation time for their health coach appointments.

45.     Health coaches consult on issues such as weight management, nutrition, exercise, stress management, diabetes, blood pressure, cholesterol, and asthma, among other things. As detailed herein, health coaches ask questions pertaining to weight, frequency of exercise, diet, alcohol intake, smoking habits, blood pressure, cholesterol, medication usage, and mental health.

46.     According to one union member, if the health coach does not get the "right" answer to his or her questions, they "harass" the employee with information and suggestions. Other union members echoed this frustration with the HEP's intrusion into their healthcare and medical choices. Jean Paul Hogan, a 69-year-old locksmith and a member of Local 35, emphasized that he "should be in charge of [his] own health and certain procedures."

47.     Lori Acker-Doyle, a 62-year-old office assistant and a member of Local 34, also says that being required to speak to a health coach "feels like a violation." She eats healthy and

works out five days a week and does not want to speak to a health coach. "I don't want some stranger calling me and nosing into my personal medical information."

48.     But union members have no choice: failure to consult with a health coach when ordered to do so results in non-compliance with the HEP—and the concomitant fine.

### III.     Medical Inquiries, Requests for Genetic Information, and Genetic Information Disclosure

49.     Through the wellness vendors that act as Yale's agents in administering the Program, Yale elicits extensive, detailed health information about employees and their spouses by requesting that they agree to release their insurance claims data.

50.     To execute the Program, Yale partners with two outside vendors, HealthMine and Trestle Tree. HealthMine, which Yale describes as administering the HEP,[7] is a privately held company that reviews data submitted by HEP participants to ensure compliance with the Program. HealthMine also identifies individuals for health coaching by reviewing individuals' test results[8] and insurance claims data—which include diagnoses codes, among other things—for what it deems "risk factors," such as multiple chronic conditions or "lab values out of range."[9] HealthMine represents that it is a business associate of Yale and that it abides by the Health Insurance Portability and Accountability Act ("HIPAA"); Yale's HEP portal represents the same.

51.     On information and belief, if HealthMine determines that an individual needs a health coach, HealthMine transfers the individual's insurance claims data—at the direction of Yale—to Yale's second vendor partner and agent, Trestle Tree, which then pairs the individual

---

[7] See Yale Position Statement at 4, filed with the Connecticut Commission on Human Rights and Opportunities, November 12, 2018.
[8] See id. at Exhibit C ("The health risk profile of participants opting into the HEP program will be evaluated by a mutually agreed third party (HIPAA compliant). The evaluation will be based on the outcomes of healthcare screenings and claim data.").
[9] See id. at 4.

with a health coach. Trestle Tree is a private company that specializes in providing health coaching.

52.     Significantly, Trestle Tree is <u>not</u> an entity covered by HIPAA, meaning that employees' information is no longer subject to certain privacy protections once it is migrated to Trestle Tree. Indeed, when HEP participants submit their Health Action Credit Forms, they must also consent to the following HIPAA waiver:

> My PHI [Personal Health Information] may be used or disclosed by Trestle Tree . . . I also understand that the information disclosed under this authorization may no longer be subject to HIPAA privacy rules.

53.     On information and belief, HealthMine accesses and transfers employees' and their spouses' insurance claims data to Trestle Tree <u>even when employees refuse to sign the HIPAA waiver</u>. For example, David Cameron, a 56-year-old control mechanic at Yale's central power plant and a member of Local 35, refused to sign the form disclosure waiving his HIPAA rights. Therefore, any information from his test results or his insurance claims should not have been migrated to HealthMine or Trestle Tree. However, after enrolling in the HEP, he was assigned a health coach for high cholesterol and contacted by Trestle Tree. He does not know how Trestle Tree received his information given that he did not sign the document waiving his HIPAA rights or otherwise authorize the transfer of his information. However, he had previously filled prescriptions for high blood pressure medication, and he believes that information was disclosed through claims data to Trestle Tree without his consent.

54.     The claims migration process reveals, and jeopardizes the privacy of, sensitive information about employees' and their spouses' medical histories, including the manifestation of a disease or disorder—information protected under the ADA and GINA.

### IV.      The Cost of Noncompliance: Heavy Fines

55.       Members of Local 34 and Local 35 who either do not participate in the HEP or fail to comply with its stringent requirements pay a high price. Yale levies a $25 "weekly fee" on union members who are not participating or are otherwise not compliant with the HEP. The fine amounts to $1,300 per year and is subject to "increases in subsequent years."[10]  For retirees subject to the Program, $25 a week is deducted from their pension checks if they are not compliant with the Program.

56.       Once an employee and/or spouse is considered noncompliant, Yale will subject him or her to the $25 weekly fine for one quarter of the year, or three months, before they have the "opportunity to opt back into the program." "Opting" in may be accomplished by complying with required health actions, including health coaching if required.

57.       Yale has repeatedly contacted union members about the fine via mail and email, encouraging them to subject themselves to mandatory medical testing and inquiries "before the HEP due date to avoid the $25 weekly fee." Such contacts have included the following:

---

[10] In its position statement filed with the Connecticut Commission on Human Rights and Opportunities, Yale represented that it "provides a reward of $25 per week" to "encourage Union members to participate in HEP." *Id.* at 2. However, no union members have reported receiving such a reward, and the reward is not referenced in any of the HEP materials provided to union members.

Our records indicate that you still have health actions outstanding.  Please check your portal to see which actions are due and, if you haven't done so already, please contact your health professional to schedule these services as soon as possible.

## What should I do next?

Please log into the HEP portal or call 844-253-1785 to confirm what you must do.

## Take action before the HEP due date to avoid the $25 weekly fee.

58.     The weekly fine is a high price to pay for privacy and protection from discrimination. It has real life consequences for those members of the Class who do not want to disclose sensitive medical information or subject themselves and their spouses to intrusive medical examinations and testing at their employer's behest. Indeed, for members of Local 34 and 35, whose base pay can be as low as $16.92 per hour for full-time employees, the fine infringes on their ability to pay for basic necessities such as food, housing, and utilities.

59.     For example, according to the Economic Policy Institute, the average monthly cost of housing in New Haven, Connecticut is $1,482 per month. Thus, over the course of a year, the $25 per week fine adds up to nearly one full month of housing costs for a resident of New Haven.[11]

60.     Additionally, the Economic Policy Institute further reports that the average monthly cost of food in New Haven is $951 per month, meaning that over the course of a year, the $25 per week fine is nearly five and a half weeks' worth of food for a resident of New Haven.[12]

---

[11] Economic Policy Institute, Family Budget Fact Sheets, https://www.epi.org/resources/budget/budget-factsheets/#.
[12] *Id.*

61.     The Economic Policy Institute calculates the average cost of childcare to be approximately $1,372 per month in New Haven. Over the course of a year, the $25 per week fine is equivalent to nearly an entire month's worth of childcare.[13]

62.     According the Bureau of Labor Statistics, the average American spends $329 per month on utilities. Over the course of a year, the $25 per week fine amounts to almost four months' worth of utilities for the average American.[14]

63.     The Bureau of Labor Statistics also reports that the average American spends approximately $171 dollars a month on gas. The $25 per week fine consumes 58% of the average American's monthly gas budget.[15]

64.     The impact of the $25 per week fine is not just theoretical. Members of Local 34 and 35 have felt the impact of the fine, with some adjusting their budgets as a result.

65.      Jason Schwartz is a 46-year-old locksmith at Yale and a member of Local 35 who did not want to participate in the HEP because of privacy concerns and because he does not want to be "forced" to go to the doctor "under threat of financial penalty." Jason described the $25 per week fine as "highway robbery." Jason explained that Yale is "forcing" union members to do "something they don't want to do" and "financially penalizing them if [they] don't do it." Jason, who has been charged the $25 per week fine since at least the beginning of 2019, explained "I have financial responsibilities" and there are "a million other things I would rather spend [the] money on," such as an account for emergency health care costs.

66.     Ralph Marguy, a 41-year-old fire inspector at Yale and member of Local 35, is currently in compliance with the HEP but was charged the $25 per week fine for approximately

---

[13] Id.
[14] Bureau of Labor Statistics, Table 1400, https://www.bls.gov/cex/22018/midyear/cusize.pdf.
[15] Id.

10 weeks because his wife was not signed up for the Program. He felt a direct impact to his budget as a result. "I have two kids in daycare," he remarked. "25 dollars was like a million." His wife is now participating, so he is compliant with the Program, but he has privacy concerns. He would prefer not to participate, but he "can't throw away $25 to keep my information private." "I feel like I had no option," he said.

67. Bill Cross, a 65-year-old fire inspector at Yale and member of Local 35, is not participating in the Program and has been charged the $25 per week fine since at least February of 2019. He decided not to participate because of concerns that his prior medical history, which he prefers to keep private, will be revealed to Yale. "It's not really my choice and it's costing me $25 per week."

68. Bill Krom, a 51-year-old general building maintenance employee and member of Local 35, is not participating because "he didn't want to be told what to do" by his employer and because he has privacy concerns. His wife is also not participating. As a result, Bill is being charged $25 per week, which is interfering with his other financial obligations, including a new roof and driveway and his mortgage payments.

69. Lise Cavallaro, a 50-year-old faculty assistant at Yale Law School and member of Local 34, is also being charged for non-compliance with the HEP. Lise could not meet the deadline for the Program's mandatory exams and testing because she has been providing caregiving for her mother for the last few years. Lise has been coordinating and overseeing her mother's doctor visits, which made it difficult for Lise to schedule and attend her own appointments. Lise feels like she is being "penalized [by Yale] for taking care of [her] mother." The $1,300 per year fine is worth three car payments for Lise.

70.    Ann Marie Macionus is a 69-year-old member of Local 34. Ann Marie is participating in the Program because she cannot afford the fine for non-participation. Ann Marie said she felt acutely the looming deadline by which she had to complete all the required tests. Ann Marie was troubled by the fact that she had to provide detailed medical information regarding her past experience with anxiety and depression. She was ultimately referred to a health coach for high cholesterol. She met with the health coach three times and had to answer questions regarding her diet.

71.    Another member of Local 35 who makes approximately $49,920 per year is not participating in the HEP because he "really didn't think [Yale] had the right to tell me who to talk to and when." He also does not want to be forced to undergo a colonoscopy. Because he is not participating, he has been losing $25 per week from his paycheck. "In my world, that's a lot of money." He has made specific adjustments to his budget to accommodate for his reduced income: "[w]e eat less, to be honest. I can't just go down the grocery aisle," he explained.

**V.    The Cost of Compliance: Loss of Civil Rights Protection Due to Financial Coercion**

72.    The $25 per week fine imposes a significant burden on certain members of the Class; so much so that paying the $25 per week fine is not a viable option. These members of Local 34 and Local 35 are forced to disclose sensitive medical information and undergo invasive testing to avoid the weekly fine.

73.    Lead Plaintiff Christine Turecek, a 57-year-old first cook and a member of Local 35, explained that she is participating in the HEP because she is a single mother who is paying for her child's college and the $25 per week fine is "the cost of my kid's books for an entire semester." To her, paying the $25 per week fine would be a "needless expense," particularly

when she has other financial pressures such as saving for retirement. Christine said she feels "forced" to participate in the HEP because her definition of "voluntary is not paying."

74.     Christine's experience with the Program has been burdensome and emotionally fraught. The HEP requires female participants over age 50 to undergo a mammogram. Christine previously underwent a double mastectomy when battling cancer and therefore could not comply with the HEP requirement to have a mammogram. As a result, an HEP representative contacted her "several times," asked about her mammogram results, and told her she would be held in non-compliance and charged the $25 per week fine if she did not get one. Christine had to repeatedly explain that she had a mastectomy. Christine described these conversations as "too invasive" and emotionally draining given that she had to repeatedly revisit her experience with cancer.

75.     Christine Marien, a 54-year-old senior administrative assistant and member of Local 34, also complies with the HEP, along with her husband, because the fine is too much for them to pay. She feels that the fine is a "punishment." Like Christine Turecek, Christine Marien has found her experience with the HEP frustrating. For example, the HEP requires a pap smear, but Christine previously underwent a hysterectomy, so she had to obtain an exception to excuse her from the pap smear requirement to avoid falling out of compliance with the Program. Christine was also referred to a health coach because she was previously overweight and used to have high blood pressure, for which she now takes medication. She has spent approximately three hours speaking with a health coach that she does not believe she needs and with whom she does not want to speak.

76.     Similarly, Katie McFarland, a 45-year-old member of Local 34, who is a senior administrative assistant at Yale, is participating in the Program because she already pays $150 per week for medical coverage and could not absorb an additional $100 per month in fees for

non-compliance. Katie's husband, John McFarland, is also participating in the Program. He was referred to a health coach for mild hypertension, although neither Katie nor John know how Yale identified him as having mild hypertension. Working with a health coach is particularly problematic for Katie's husband, a paramedic supervisor who has to respond to emergency situations and therefore has an unpredictable schedule. Nevertheless, Yale required him to speak with a health coach during normal work hours.

77.     Rosanna Gonsiewski, a 50-year-old senior administrative assistant and member of Local 34, and her husband also find the Program seriously burdensome, but they "submit[]" to it because the fees add up to a mortgage or tuition payment. The Program required Rosanna to undergo a colonoscopy, and she prepared for and attended appointments for the procedure four separate times due to complications. Each time, she took three sick days off of work for preparation and the procedure itself.  In all, she used 12 sick days in order to comply with the Program's colonoscopy requirement. This depleted her sick time, and when she later came down with the flu, she had to use unpaid leave. Rosanna's husband, Glenn Gonsiewski, has also been forced to participate in the Program. He was referred to a health coach for his cholesterol.

78.     Dana Kalina is a 50-year-old administrative assistant and a member of Local 34. Dana is participating in the Program solely to avoid the fee, which she feels is "forced participation." As part of her participation, she has scheduled a mammogram and completed a colonoscopy. For the colonoscopy, she had to use two days' worth of sick time to complete the procedure. She has also been referred to a health coach for diabetes and was required to participate in 3.5 hours of coaching sessions to remain in compliance with the Program. The health coach asked her a variety of questions about her health, including whether she has any

chronic illness, whether she has high blood pressure, whether she has high cholesterol, whether she smokes or drinks alcohol, how much she exercises, and whether she is overweight.

79.     Another female member of Local 34 and her husband are participating in the Program to avoid being penalized. She was referred to a health coach and had several calls with the coach. The first call was one hour long. The health coach asked her a range of questions, including questions about her weight, her diet, her blood pressure, including whether she takes her blood pressure medication, and her mental health, including whether she has suicidal thoughts. She described the process of speaking with the health coach as "very uncomfortable" because she was required to provide sensitive information to someone who is not her doctor and who does not know her. "I go to the doctor regularly, so why do I have to talk to someone else?" she asked.

80.     Another member of Local 35 who is a cook's helper at Yale and makes approximately $37,000 annually explained that she is participating in the HEP because of the impact the $25 per week fine would have on her finances. She has other financial obligations that are more pressing. For example, she provides some financial support for her son who lives at home and has cerebral palsy. As a single person, she explained the $25 per week fine would "be noticeable, no doubt about it." She explained she would have to reduce her grocery bill or a similar expenditure if she was incurring the $25 per week fine. For her, it's a "tank of gas." As a result of her participation in the HEP, she has undergone a colonoscopy, a mammogram, a tuberculosis screening, and a cholesterol screening. She said she has spent "countless hours" with doctor's visits and phone calls as a result of her participation. She had to use her sick time to take a day off for a colonoscopy.

81.     Jim Limosani, a 49-year-old locksmith at Yale, echoed his fellow Local 35 members. He is participating in the Program "because I don't want to pay the $25 a week. That's an expensive proposition right there."

82.     Laurene Goode-Gade, a 54-year-old full time administrative assistant at Yale and member of Local 34, is participating in the Program to avoid the fine, which is equivalent to her "gas money per week." "[B]asically, it's not an option," she says. As part of her participation in the Program, Laurene has completed blood work and a physical. She recently received a letter informing her that if she does not complete a mammogram soon, she will be charged the weekly fine.

83.     Lead Plaintiff Lisa Kwesell, a member of Local 34, is participating in the Program to avoid the $25 per week fee. Her take-home paycheck after deductions is approximately $352 a week, on average. Lisa explained: "[Yale] want[s] me to eat healthy, [but] I couldn't afford to buy good produce or good meat" if the $25 week fine applied to her. "Another $1,300 out of my paycheck would really hurt me."

84.     Another member of Local 34 is participating in the Program because of the "simple fact that Yale is going to start going into [her] check" if she does not. "I work hard for my money" and "I'm on a fixed budget." "There is no way in the world that they are going to take $25 per week out of a 30 hour check." She makes approximately $37,400 per year, and the $25 per week fee would impose a significant burden on her. Although she is participating in the Program, she recently missed a scheduled mammogram appointment because of a sudden death in her family. She promptly rescheduled the mammogram, but had to wait approximately two months before she could be seen. Yale immediately started sending her notices that it would start

deducting $25 per week from her paycheck due to the missed mammogram. She said she feels like Yale is "attacking [her] about a mammogram."

85.     Mary Brassil is a 72-year-old member of Local 34. She is a full-time transcriptionist at Yale. Mary is participating in the Program because she cannot afford the opt-out fee. "If I save [the $25/week] I can buy groceries. I am a widow and I am by myself with nobody else to depend on." As part of her participation in the Program, Mary was required to complete health coaching. She was not informed as to why she was selected for coaching, but she participated in the sessions to avoid the fee. As part of her sessions, she was provided with a tape measure to measure herself. After four sessions, she thought she was done speaking with a health coach, but she recently received a flyer in the mail informing her that she must speak with a health coach again or face the $25 per week opt-out fee. Mary feels that "Yale is dictating [her] life."

## VI.   The Yale Police Benevolent Association Implements Voluntary Health Expectations Program

86.     While Yale forces Class members to either participate in the HEP or pay a hefty privacy fine, members of the Yale Police Benevolent Association ("YPBA") are not fined for non-participation. The YPBA is the union that represents the members of the Yale Police Department.

87.     When Yale raised the specter of including a fine for non-participation in the HEP during bargaining negotiations with YPBA, negotiations stalled. According to the *Yale Daily News*, YPBA balked at the inclusion of a HEP with a $25 per week non-participation fine, noting that "HEP's top-down approach and opt-out fee constitute a massive change that YPBA

members were not anticipating, adding that union members were 'very upset' when they found out about the new policy."[16]

88.     Eventually, Yale and the YPBA reached an agreement that did not require YPBA members to pay a fine for non-participation in the HEP. As explained in the *New Haven Independent*, a member of the YPBA "praised [union] leadership for resisting Yale's demand that, like members of Yale's UNITE HERE unions, the cops participate in a Health Expectations Program (HEP) that requires mandatory medical tests as well as coaching for those with chronic conditions."[17]

89.     Yale acknowledges that the HEP is "voluntary" for YPBA members precisely because no fee is required. In a flyer describing the HEP, Yale expressly contrasts the $25 fine for UNITE HERE members with "voluntary" participation for YBPA members:

## If You Choose Not to Participate

You may choose to opt out of the Health Expectations Program on a quarterly basis. By opting out, you agree to pay the $25 fee per week. The opt out fee will be payroll deducted on a weekly basis.

Any participant who opts out of HEP may opt back in on a quarterly basis.

## YPBA Staff

The HEP program is voluntary for YPBA staff and their covered spouses – no opt out fees will apply for non-participation or non-compliance.

### EXHAUSTION OF ADMINISTRATIVE REMEDIES

90.     Lisa Kwesell filed a timely, class-based Charge of Discrimination with the EEOC and the Connecticut Commission on Human Rights & Opportunities on September 10, 2018, alleging that the HEP violates the ADA and GINA.

---

[16] Amy Cheng, *YPD union contract stalls over health benefits*, Yale Daily News (2017), https://yaledailynews.com/blog/2017/09/22/ypd-union-contract-stalls-over-health-benefits/.
[17] Allan Appel, *Yale Police Union Ratifies 7-Year Contract*, New Haven Independent (2018), https://www.newhavenindependent.org/index.php/archives/entry/yale_police_union_ratifies_contract/.

91.     The Connecticut Commission on Human Rights & Opportunities issued a Release

of Jurisdiction that Lisa received on April 26, 2019, and the EEOC issued a Right-to-Sue letter

that Lisa received on May 28, 2019.

92.     By filing this federal action within 90 days of Lisa receiving the Connecticut

Commission on Human Rights & Opportunities Release of Jurisdiction, Plaintiffs have satisfied

all administrative prerequisites under the ADA and GINA.

## CLASS ACTION ALLEGATIONS

93.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

Procedure 23(a), 23(b)(2), and 23(b)(3) on behalf of all current and former Yale employees who

are or were required to participate in the HEP or pay a $25 weekly fine between January 1, 2017,

and present, including a sub-class of these employees whose spouses are or were required to

participate in the HEP or pay the same fine during that time period. Plaintiffs seek declaratory

and injunctive relief, lost wages, and non-economic damages.

94.     Certification under Rule 23(b)(2) is appropriate because Yale has acted or refused

to act on grounds that apply generally to the class and final injunctive or declaratory relief is

appropriate respecting the class as a whole. The policy that class members either adhere to the

HEP or pay a $25 per week fine is uniform, thereby making declaratory and injunctive relief

appropriate to the Class as a whole.

95.     Certification under Rule 23(b)(3) is appropriate because Plaintiffs seek monetary

damages on behalf of class members and because common questions of law and fact

predominate over individualized inquiries and a class action is a superior method for

adjudication, as discussed further below. The HEP policy was uniformly applied to all class

members.

## I.      Numerosity

96.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of class members is presently unknown, Plaintiff estimates that there are as many as 5,400 class members. The exact number of class members can only be ascertained through appropriate discovery.

## II.     Commonality

97.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual class members. Among the questions of law and fact common to the Class are:

    a)  whether Yale's acts as alleged herein violate the ADA;

    b)  whether Yale's acts as alleged herein violate GINA;

    c)  whether the medical examinations and inquiries and requests for genetic information in Yale's HEP are voluntary, as required by the ADA and GINA;

    d)  whether the disclosure of genetic information as alleged herein violates GINA;

    e)  the nature and extent of the class-wide injury and the appropriate measure of damages for the Class; and

    f)  whether declaratory/injunctive relief is warranted.

98.     Plaintiffs' claims arise from the same HEP policy and course of conduct on the part of Yale, and Plaintiffs' claims are based on the same legal and remedial theories as those of the proposed Class and involve similar factual circumstances. Further, the injuries suffered by Plaintiffs are similar to the injuries suffered by class members, and Plaintiffs seek common

forms of relief for themselves and members of the Class, including injunctive and declaratory relief, lost wages, and non-economic damages.

## III.    Typicality

99.    Plaintiffs' claims are typical of the claims of the members of the Class because all members of the Class are similarly affected by Yale's alleged violation of the ADA and GINA complained of herein. Plaintiffs are affected by Yale's alleged violation of the ADA and GINA in the same manner as other class members. Their right to voluntarily participate in the HEP has been denied by Yale's imposition of a financial penalty for non-participation. And, as a result, class members have incurred lost wages for non-participation and non-economic damages whether they participate in the HEP against their will or refuse to participate in the HEP's unlawful and discriminatory program requirements.

## IV.    Adequacy

100.    Plaintiffs will fairly and adequately protect the interests of class members and have retained counsel competent and experienced in class action litigation and the claims asserted herein.

## V.    Predominance

101.    Common questions of law and fact predominate over any questions affecting only individual members of the Class. Specifically, questions concerning whether Yale violated the ADA and the GINA predominate over any individualized questions.

## VI.    Superiority

102.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable and individual class members may lack the financial resources to vigorously prosecute this action. Class

treatment will obviate the need for unduly duplicative litigation that might result in inconsistent judgments.

## CAUSES OF ACTION

## COUNT I – VIOLATION OF THE ADA AS TO PLAINTIFFS KWESELL, TURECEK, AND SCHWARTZ

103.    Plaintiffs Kwesell, Turecek, and Schwartz incorporate by reference all preceding allegations in this Complaint as if fully pled in this Count.

104.    Yale is a covered entity under 42 U.S.C. § 12111(2) and § 12111(5)(A) because it is an employer engaged in an industry affecting commerce with 15 or more employees.

105.    Yale requires medical examinations and makes inquiries of employees in violation of 42 U.S.C. § 12112(d)(4)(A) and (B) because the medical examinations required under the HEP are not "voluntary" components of an employee wellness program.

106.    The testing required under Yale's HEP includes medical examinations within the meaning of the ADA because the required testing is administered by a health care professional or in a medical setting and seeks information about an individual's physical or mental impairment or health. The testing requires blood draws and cholesterol testing.

107.    The HEP's questions and requests for insurance claims data from insurance providers are medical inquiries within the meaning of the ADA because they are likely to elicit information about a disability.

108.    Yale imposes a $25 per week fine on those who do not submit to medical inquiries and examinations.

## COUNT II – VIOLATION OF THE ADA AS TO THE CLASS

109.    Plaintiffs incorporate by reference all preceding allegations in this Complaint as if fully pled in this Count.

110.    Yale is a covered entity under 42 U.S.C. § 12111(2) and § 12111(5)(A) because it is an employer engaged in an industry affecting commerce with 15 or more employees.

111.    Yale's HEP requires a medical examination and makes inquiries of employees in violation of 42 U.S.C. § 12112(d)(4)(A) and (B) because the medical examinations and medical histories involved in the HEP are not "voluntary" components of an employee wellness program.

112.    The testing required under Yale's HEP is a medical examination within the meaning of the ADA because the testing is administered by a health care professional or in a medical setting and seeks information about an individual's physical or mental impairment or health. The testing requires blood draws, and cholesterol testing.

113.    The HEP's questions and requests for insurance claims data from insurance providers are medical inquiries within the meaning of the ADA because they are likely to elicit information about a disability.

114.    Yale imposes a $25 per week fine on those who do not submit to medical inquiries and examinations.

## COUNT III - VIOLATION OF GINA AS TO PLAINTIFFS KWESELL AND SCHWARTZ

115.     Plaintiffs Lisa Kwesell and Jason Schwartz incorporate by reference all preceding allegations in this Complaint as if fully pled in this Count.

116.    Yale's HEP violates GINA, 42 U.S.C. § 2000ff-1(b), because Yale is an employer requesting, requiring, or purchasing genetic information with respect to an employee or family member of the employee without voluntary authorization from the employee.

117.    GINA defines "family members" as dependents under ERISA, or those related (up to four degrees) to the employee or dependent. ERISA permits individuals to claim dependents "through marriage, birth, adoption, or placement for adoption." This includes spouses. Thus, medical information relating to manifested conditions of spouses is the employee's family medical history, which is genetic information under GINA. 29 C.F.R. § 1635.3(a)(1).

118.    The HEP's testing requirement for spouses, which includes Yale's agents' obtaining test results to analyze them for risk factors, is a request for genetic information because it elicits information about the manifestation of a disease or disorder in the employees' family members.

119.    The HEP's transfers of insurance claims data from insurance providers through Yale's agents are requests for genetic information because they elicit information about the manifestation of a disease or disorder in the employees' family members.

120.    Yale's transfer, through its agents, of insurance claims data about employees' spouses from insurance providers to wellness vendors and from HealthMine to Trestle Tree are unlawful disclosures of genetic information under 29 U.S.C. § 1635.9.

121.    In connection with the HEP, Yale unlawfully disclosed Plaintiff Kwesell's and Plaintiff Schwartz's spouse's genetic information. 29 C.F.R. § 1635.9.

122.    Yale imposes a $25 weekly fine on those who do not submit to the acquisition of genetic information.

## COUNT IV - VIOLATION OF GINA AS TO THE GINA SUBCLASS

123.     Plaintiffs incorporate by reference all preceding allegations in this Complaint as if fully pled in this Count.

124.    Yale's HEP violates GINA, 42 U.S.C. § 2000ff-1(b), because Yale is an employer requesting, requiring, or purchasing genetic information with respect to an employee or family member of the employee without voluntary authorization from the employee.

125.    GINA defines "family members" as dependents under ERISA, or those related (up to four degrees) to the employee or dependent. ERISA permits individuals to claim dependents "through marriage, birth, adoption, or placement for adoption." This includes spouses. Thus, medical information relating to manifested conditions of spouses is the employee's family medical history, which is genetic information under GINA. 29 C.F.R. § 1635.3(a)(1).

126.    The HEP's testing requirement for spouses, which includes Yale's agents' obtaining test results to analyze them for risk factors, is a request for genetic information because it elicits information about the manifestation of a disease or disorder in the employees' family members.

127.    The HEP's transfer of insurance claims data from insurance providers are requests for genetic information because they elicit information about the manifestation of a disease or disorder in the employee's family member.

128.    Yale's transfer of insurance claims data about employees' spouses from insurance providers to wellness vendors and from HealthMine to Trestle Tree are unlawful disclosures of genetic information under 29 U.S.C. § 1635.9.

129.    In connection with the HEP, Yale unlawfully discloses class members' genetic information. 29 C.F.R. § 1635.9.

130.    Yale imposes a $25 weekly fine on those who do not provide genetic information.

**PRAYER FOR RELIEF**

131.   WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that the Court:

a)   certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b)   designate Lisa Kwesell, Christine Turecek, and Jason Schwartz as the representatives of the Rule 23 Class and the undersigned counsel as counsel for the Class;

c)   declare Yale's conduct to be in violation of the ADA and GINA;

d)   enter an injunction prohibiting Yale from continuing to impose a $25 per week fine on those who do not submit to the medical examinations required under the HEP;

e)   enter an injunction prohibiting Yale from causing employees' and their spouses' insurance claims data to be transferred to HealthMine, Trestle Tree, or any third-party vendor without employees' and spouses' consent, which must not be obtained under threat of a monetary or other penalty;

f)   enter an injunction designed to protect and monitor class members' privacy in the context of the HEP, including but not limited to purging medical and genetic information previously collected through the HEP;

g)   award economic and non-economic damages;

h)   award expenses, including reasonable attorney's fees; and

i)   grant such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

132.    Plaintiffs demand a trial by jury.

**RESPECTFULLY SUBMITTED,**
**THE PLAINTIFFS**

by:      */s/ Joshua R. Goodbaum*
GARRISON, LEVIN-EPSTEIN,
        FITZGERALD & PIRROTTI, P.C.
Joshua R.  Goodbaum (ct28834)
Joseph D. Garrison (ct04132)
Elisabeth J.  Lee (ct30652)
405 Orange Street
New Haven, Connecticut, 06511
Tel.:  (203) 777-4425
Fax:  (203) 776-3965
jgoodbaum@garrisonlaw.com
jgarrison@garrisonlaw.com
elee@garrisonlaw.com

AARP FOUNDATION LITIGATION
Dara S. Smith (*pro hac vice*)
Elizabeth Aniskevich (*pro hac vice*)
Daniel B. Kohrman (*pro hac vice*)
601 E Street, NW
Washington, DC 20049
Tel: (202) 434-6280
Fax: (202) 434-6424
dsmith@aarp.org
eaniskevich@aarp.org
dkohrman@aarp.org

*Counsel for the Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that, on the above-stated day, a copy of the foregoing was filed electronically *[and served by mail on anyone unable to accept electronic filing]*.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system *[or by mail to anyone unable to accept electronic filing]*.  Parties may access this filing through the Court's system.

*/s/ Joshua R. Goodbaum*
Joshua R. Goodbaum