```
                UNITED STATES DISTRICT COURT
                  DISTRICT OF CONNECTICUT


_____
KIM KWESELL, ET AL.,            )
               Plaintiffs,      ) No: 3:19-CV-1098 (KAD)
                                )
       v.                       ) December 2, 2019
YALE UNIVERSITY,                )
               Defendant.       ) 2:13 p.m.
_____ )
                                  Brien McMahon Federal Building
                                  915 Lafayette Boulevard
                                  Bridgeport, CT 06604



              IN-COURT 16(b) SCHEDULING CONFERENCE



B E F O R E:
          THE HONORABLE KARI A. DOOLEY, U.S.D.J.
```

```
Courtroom Deputy:                Official Court Reporter:
Kristen Gould, Esq.              Tracy L. Gow, RPR

                 Chambers: 203.579.5522
```

```
 1   A P P E A R A N C E S:

 2   For the Plaintiffs:
          JOSHUA R. GOODBAUM, ESQ.
 3        Garrison Levin-Epstein Fitzgerald & Pirrotti, P.C.
          405 Orange Street
 4        New Haven, CT 06511
          203-777-4425
 5        Email: jgoodbaum@garrisonlaw.com

 6        ELIZABETH ANISKEVICH, ESQ.
          DARA SMITH, ESQ.
 7        DANIEL BENJAMIN KOHRMAN, ESQ.
          AARP Foundation Litigation
 8        601 E St. NW
          Washington, D.C. 20049
 9        202-434-6280
          Email: eaniskevich@aarp.org
10               dsmith@aarp.org
                 dkohrman@aarp.org
11
     For the Defendant:
12        KIM E. RINEHART, ESQ.
          JONATHAN M. FREIMAN, ESQ.
13        RICHARD LUEDEMAN, ESQ.
          Wiggin & Dana
14        One Century Tower
          265 Church Street, P.O. Box 1832
15        New Haven, CT 06508-1832
          203-498-4400
16        Email: krinehart@wiggin.com
                 jfreiman@wiggin.com
17               rluedeman@wiggin.com

18
     Also present:
19        ALEXIS BEYERLEIN, ESQ. - Law Clerk

20

21

22

23

24

25
```

1          (Call to Order, 2:13 p.m.)

2          THE COURT:  Good afternoon, everybody.

3          ALL:  Good afternoon, Your Honor.

4          THE COURT:  This is the matter of Kwesell v. Yale

5    University.  Let me ask counsel to please identify yourselves

6    for the record.

7          MR. GOODBAUM:  Good afternoon, Your Honor. Josh

8    Goodbaum from Garrison Levin-Epstein in New Haven for the

9    Plaintiffs, Ms. Kwesell and the putative class.  With me are

10   Dara Smith and Elizabeth Aniskevich.  And on the phone,

11   listening but not speaking, is Daniel Kohrman, who is in D.C.

12         MR. KOHRMAN:  I'll just speak to say good afternoon,

13   Your Honor.  And now I'm done.  Thank you.

14         THE COURT:  All right.  Good afternoon, Mr. Kohrman.

15         And for Yale.

16         MS. RINEHART:  Good afternoon, Your Honor.  Kim

17   Rinehart of Wiggin & Dana on behalf of Defendant Yale

18   University, and with me is Jonathan Freiman and Richard

19   Luedeman.

20         THE COURT:  All right.  The Court received the

21   parties' Rule 26(f) report some time ago, and has since

22   received a motion to stay the proceedings.  We convened this

23   afternoon for purposes of setting a case management schedule,

24   and I will just note a few things preliminarily.

25         At the time the 26(f) report was submitted, it was

1    the Defendant's intention at that time to file a motion to

2    dismiss, and a lot of the discussion in the Rule 26(f)

3    derived from that then present intention.  But I will note

4    that the Defendants have gone ahead and answered the amended

5    complaint, which really put us in a position of simply

6    setting the deadlines that Rule 16(b) requires and I think

7    having a discussion about what the parties anticipate case

8    management and discovery in the case to look like.

9         But then, sort of casting a condition on that type

10   of discussion, was the Defendant's motion to stay

11   proceedings.  And it made sense to me to take that up first,

12   and I do have a number of questions.  I don't intend to limit

13   what anybody might want to say on the issues, but I thought

14   that I would begin by asking some questions.

15        If I understood the motion correctly, everybody

16   is -- well, there may be disagreement as to when these things

17   might arrive, it appears that there are going to be EEOC

18   regulations being issued with respect to both the ADA and the

19   Genetic Information Non-discrimination Act and its

20   implementation and policies.  Is that a fair statement?

21        MS. RINEHART:  That is correct, Your Honor.

22   Essentially what happened here is that there was an old EEOC

23   regulation issued in 2016.  It specifically permitted the

24   kinds of incentives that were used in Yale's program, and

25   which have been used in many places, like the State of

1  Connecticut, the City of New Haven, and across the country.

2          Those regulations were declared invalid on

3  procedural grounds, and were ultimately withdrawn by the EEOC

4  in December of 2018.  The EEOC was without enough

5  commissioners to promulgate a new regulation at the time, but

6  has since gained a quorum -- as of, I believe, May.  They

7  placed us back on the agenda, and we have contacted the

8  EEOC's counsel.  They said if there was to be a pushback, it

9  would be noted in their -- essentially their revised agenda,

10  which that was just issued.  We were waiting for that

11  issuance.  And they have said that they anticipate

12  promulgating the regulation by the end of January, 2019.

13          THE COURT:  '20.

14          MS. RINEHART:  So under those circumstances, we

15  felt --

16          THE COURT:  2020.

17          MS. RINEHART:  I'm sorry.  2020, yes.

18          So under those circumstances, we felt that, because

19  this is really a case that is about a regulatory gap, it was

20  better for us not to move to dismiss but to wait to get that

21  guidance, and so that Your Honor would have the benefit of

22  that, as well, when making the decision.

23          THE COURT:  So let me just stop you there.  So I

24  take it we don't know what these regulations are going to

25  say; is that a fair statement?

1          MS. RINEHART:  I think we won't know for certain

2     until they are issued.

3          THE COURT:  Okay.  And once they are issued -- the

4     case itself derives from a period of time where there

5     weren't -- they didn't have regulations; right?  Is that

6     fair?

7          MS. RINEHART:  They are suing for both a period of

8     time where there were regulations and where there were not,

9     is my understanding.

10          THE COURT:  Okay.  Let me ask Plaintiffs.  I

11     understand that you oppose any stay, even through January

12     awaiting these regulations.  That's right?

13          MS. SMITH:  Yes, Your Honor.

14          THE COURT:  Okay.  So there would appear to be a

15     disagreement between the two of you as to the impact that

16     these regulations will have on the scope of the litigation.

17          In terms of the claims you bring for a time period

18     when we had the regulations, are you -- is it part of your

19     claim that, those regulations notwithstanding, the incentive

20     programs were in violation of the statutes?

21          MS. SMITH:  I would say yes, Your Honor.  But if you

22     would let me clarify briefly.  Our position is that once the

23     2016 regulations were invalidated, the state of the law

24     reverted to its pre-2016 state, which is why we're arguing

25     that there were no penalties.  So we don't believe there are

1    no regulations in place, we just believe that the law has

2    reverted to the status quo before the 2016 regulation.

3              THE COURT:  Okay.  Were they invalidated -- all

4    right.

5              And what's your view -- it seems to make sense to

6    me, that if these regulations may very well sort of define

7    the scope of the claim, unless there's going to be a claim

8    that these regulations are somehow unconstitutional or

9    whatnot, that it might make sense to await them, if that

10   makes sense.

11             So do you agree that, depending on what they say,

12   they will in all likelihood impact the scope of the

13   Plaintiffs' claims, at least as far as timing goes?

14             MS. SMITH:  Your Honor, I believe they could affect

15   the scope of the Plaintiffs' case -- the Plaintiffs' claims,

16   I'm sorry -- starting when they go into effect prospectively.

17             So for this period of time, starting mid 2017 --

18   August, 2017, when the 2016 regulations were invalidated

19   through when the new regulations go into place, which is

20   currently proposed to be 2020, those claims --

21             THE COURT:  Hopefully.

22             MS. SMITH:  We'll see.

23             -- those claims will persist.

24             And, so, regardless of what the regulations say, how

25   they affect these claims, whether they're valid, for that

1    period of time our case will be the same.  And the very

2    limited amount of discovery that we're asking to do right now

3    would be the same, no matter what.

4          THE COURT:  And do you disagree with that?

5          MS. RINEHART:  We do, Your Honor.

6          THE COURT:  Why?

7          MS. RINEHART:  I mean, imagine a circumstance where

8    the EEOC has had a regulation in place for multiple years

9    saying specific financial incentives are appropriate.  That

10   regulation is consistent with the Affordable Care Act, which

11   specifically says you can do this, it's consistent with

12   regulations under various other statues.

13         THE COURT:  I don't need the case on the merits,

14   Counsel.  Just, if you could, just why does the -- whatever

15   these regulations say, why does it change the Plaintiff's

16   claim for the time period that she just outlined?

17         MS. RINEHART:  Right.  I think my point is, Your

18   Honor, we have every reason to believe that the EEOC's new

19   regulation will be very similar to the old regulation because

20   it was simply invalidated on procedural grounds.

21         And we think that the Court does not have to ignore

22   the fact that there is a regulation making this conduct

23   permissible, making clear that it's permissible, and another

24   regulation which we believe will make clear that this conduct

25   is permissible, merely because there is a smaller gap.

1            These are interpretive regulations.  I don't think

2    it's likely that any court is going to reach the conclusion

3    that conduct that is permissible under the law for two years,

4    is permissible under the law for all time in the future, is

5    suddenly impermissible for a few months.

6            And there are, you know, multiple court cases that

7    have found incentives to be acceptable, even, you know, just

8    generally speaking.

9            MS. SMITH:  May I speak to that, Your Honor?

10           THE COURT:  You may.

11           MS. SMITH:  In the *Orion* case in Wisconsin, which we

12   disagree with the outcome on voluntariness, there was a

13   similar timing issue.  And the 2016 regulations were not made

14   retroactive.  So the Court was very clear in doing its

15   analysis that, even though it is an interpretive regulation

16   in some way, when the EEOC promulgated the regulations

17   setting what was permissible and what was not, it was not

18   retroactive as to the time before the regulations were in

19   place.

20           So as of now, we're in that exact same state, with

21   the regulations from 2016 not being in place, new regulations

22   not being in place, and they're not going to be able to be

23   retroactive to this time period.

24           I think it's important, also, to point out that the

25   2016 regulations were not invalidated based on a procedural

1   error, like it needed a couple more days of comments.  There

2   was a very serious problem with a lack of reasoned

3   explanation.  And when the Court invalidated them, the

4   decision said that -- and I appreciate that we're not

5   discussing the merits, but that it would be very difficult on

6   the record that they had then for the agency to come out with

7   the same rules.

8        So I don't know what they're going do, but I think

9   to assume that this is just a pause while they correct a

10  technical error is not correct, based on that decision.  The

11  regulations were never valid.

12        THE COURT:  Between 2016 and now?

13        MS. SMITH:  Yes, Your Honor.

14        THE COURT:  So, hypothetically speaking, if the EEOC

15  comes out with regulations that say under no circumstances

16  can an employer impose opt-out financial burdens, for lack of

17  a better term, they come out and they say whatever you did

18  you can't do it -- collective bargaining agreement,

19  whatever -- you cannot do it, and the flipside of that is

20  they come out with a regulation that says everything you're

21  doing is perfectly acceptable under the statutes, why don't

22  we still --

23        I mean, I understand your position is that with a

24  prior reg that says we can do it and a future reg that says

25  we can do it, now we're in a much better position

1     substantively in defending the litigation.  But it doesn't

2     mean the litigation doesn't go forward and they don't get to

3     pursue their claims for the period of time they're talking

4     about.  And doesn't that require discovery?  And what are we

5     gaining by waiting?

6          If this is going to have to be litigated either way,

7     even if the regulation blesses your plan, maybe substantively

8     you're in a better position, but is it that you are looking

9     at that point to file a motion for judgment on the pleadings?

10    Or how does your plan forestall the need for discovery on the

11    existing claims, regardless of what the regulations say?

12          MS. RINEHART:  I think it's a matter of just

13    sequencing, Your Honor.  We don't know what the EEOC reg will

14    say.  It could say something like you have to base it on the

15    individual person's financial means.  It could say that any

16    monetary incentive is fine.  Whatever it does say, it's going

17    to mold the scope of discovery for a substantial time period,

18    right, the current time period.

19          And we don't think it makes sense to go down the

20    road of taking, for example, corporate depositions that are

21    based on what their current views of the case are and what

22    the old regulations said, from our standpoint, when we know

23    there's going to be additional information that will mold the

24    scope of the case very soon.  And, yeah, it would be

25    really -- we think a much wiser course to have those

1    depositions take place when we know the full contours of the

2    landscape.

3         THE COURT:  But the contours of the landscape are

4    going to change only prospectively.  If I understand what I'm

5    being told correctly, that this period of time in which the

6    regulation had been invalidated until the time that a new one

7    is put in place, that landscape is not going to change in

8    terms of the nature and scope of the Plaintiff's theory.

9         MS. RINEHART:  The Plaintiff has an argument that

10   for all of the time periods, even when the regulation was in

11   place, that they can bring claims.  And we're prepared to

12   litigate that issue and the impact of the regs, both the reg

13   that was in existence and has been invalidated on procedural

14   grounds, as well as the impact of the new reg on this little

15   gap period.

16        But whatever regulation comes out is going to inform

17   what information is needed from every witness, right.

18   Because whatever they determine -- whatever the EEOC

19   determines now is the meaning of voluntary and how much of a

20   financial incentive can be permitted and still have a program

21   be voluntary, those factors may require the answering of

22   different questions.

23        And it's our view that to have people going through

24   depositions where we don't know if they're going to have to

25   be deposed again a month from now because the relevant

1    questions will be different, the scope of what they're going
2    to be asked may be different, and we do believe that there is
3    a strong likelihood that the EEOC's new regulation will
4    permit us to move for summary judgment or for judgment on the
5    pleadings.
6         MS. SMITH:  Your Honor, if I could be a little bit
7    specific about the discovery that we are seeking to do in
8    this period, to do cross-motions for summary judgment, which
9    is what we had been discussing before this came up.  We would
10   like to do one 30(b)(6) deposition, which we anticipate
11   taking probably about half a day, and to get two documents
12   that outline basically the nature of the wellness program.
13   There are a few questions that we have based on the denials
14   in the answer about how the program works, very generally.
15        For us, that's all that would be needed to do
16   cross-motions for summary judgment on the voluntariness of
17   the program during this period of time.  That is discovery
18   that we are going to have to do no matter what.  And I
19   understand that there may have to be more depositions taken
20   later for different purposes, but we believe that that is
21   what will substantially influence the direction of the
22   case -- cross-motions for summary judgment on voluntariness
23   now.
24        And that may not dispose of the entire case, but we
25   think it's the most efficient way to proceed, and we don't

1   need voluminous discovery with PHI.  We don't need a lot of

2   individualized information.  Right now, our view is a purely

3   legal one.  We don't even think we disagree on the facts.  We

4   just need a little bit more information to describe them as

5   accurately as possible.

6        THE COURT:  So you would like a 30(b)(6) and some

7   documents, and then you plan to move for partial summary

8   judgment?

9        MS. SMITH:  Yes, Your Honor.

10       THE COURT:  And I take it you would be either moving

11  or opposing partial summary judgment with the regulations

12  that are going to be forthcoming, at least as evidence of

13  what is or is not voluntary?

14       MS. RINEHART:  I guess I don't know the --

15       THE COURT:  Because the idea -- I'll be honest with

16  you.  The idea that between now and the end of January

17  there's going to be discovery, full briefing on a motion for

18  summary judgment, and that -- it's not going to even be fully

19  briefed by the end of January.  Not even close.

20       MS. RINEHART:  That's sort of our point, Your Honor.

21  We're so close to getting guidance that could very well

22  influence what the scope of the relevant discovery is.

23  Should that corporate deposition happen before we get that

24  guidance so that that person may well have to undertake a

25  second deposition once it comes out?

1        If these are the simple issues we have to resolve,

2   let's wait for the regulation, engage in any limited

3   discovery that is necessary, which will be appropriately

4   tailored to cover all the potential relevant issues, and then

5   do our cross-motions.

6        THE COURT:  What does the crystal ball say about the

7   timing of these proposed regulations actually being

8   published?

9        MS. RINEHART:  Well, the actual agenda that was

10  published by the EEOC has said January of 2020.  So absent a

11  change in that, they would anticipate promulgating the

12  proposed regulations in January of 2020.

13       THE COURT:  And once they're proposed, what is the

14  timeline between proposal, comment and effective date?

15       MS. RINEHART:  There is a 60-day comment period, is

16  my understanding.

17       MS. SMITH:  Your Honor, if I could respond to that.

18  There's the 60-day comment period, then regulations have to

19  go through R&B, so it could be potentially longer before this

20  is finalized.  Our major problem with that is that in the

21  meantime our clients are being harmed.  And even though some

22  of them are paying penalty, some of them, as we've alleged in

23  the complaint, cannot afford to pay the penalty and are

24  having to undergo medical examinations and reveal information

25  they don't want to.

1          THE COURT:  How do I do partial summary judgment on

2    a class that hasn't been certified?  I mean, even if I accept

3    whole-heartedly your argument, I have however many named

4    plaintiffs.  Those are the only people who are going to be

5    impacted by that.  Unless and until there's a certification,

6    I'm not sure how we get there.  And I don't see us getting

7    there any time between now and the spring, either, just as a

8    practical matter.

9          I mean, unless I'm completely -- it's entirely

10   possible I'm completely wrong about that.  But you're talking

11   about your clients in terms of the class, I assume.  And

12   until the class is certified, I'm not affording any relief to

13   anybody other than the named Plaintiffs.  Is that not

14   correct?

15          MS. SMITH:  That's right, Your Honor.  That's right.

16          THE COURT:  Are you all contemplating class

17   discovery, or is it pretty easy to identify and ascertain the

18   members of the class?

19          MS. SMITH:  Oh, I thought you were standing up

20   because you wanted to -- I can answer it.

21          MR. GOODBAUM:  We have an odd division of labor,

22   Your Honor.  That's all.  I'm not stepping on anyone's toes.

23          THE COURT:  Fair enough.

24          MS. SMITH:  We would anticipate doing class

25   discovery to ascertain what the class was if we prevailed in

1    the legal determination of what voluntariness was.  So that's

2    why we had envisioned this step -- this sequencing of events,

3    as my colleague put it.  Because, really, if voluntariness is

4    an individual determination, this is a very different case.

5    If voluntariness is a legal determination that's an

6    across-the-board no penalty standard, which is what we've

7    alleged, or even an across-the-board any standard that would

8    apply programwide, as we assume it would, because that makes

9    sense for a wellness program, it's going to apply equally to

10   everyone.

11          And I don't want to preview class cert arguments,

12   but we think that determining what voluntariness is is

13   actually more efficient than going through the entire class

14   certification process first.

15          THE COURT:  And is there agreement that there's no

16   discovery needed on the question of -- well, there's not

17   agreement, obviously.  But you believe that the only

18   discovery that's necessary on that legal question is what

19   you've outlined?

20          MS. SMITH:  Yes, Your Honor.

21          THE COURT:  Okay.  And what's your position, in

22   terms of what discovery might be necessary to that legal

23   question of what "voluntary" under the statute is?

24          MS. RINEHART:  Your Honor, we have a number of

25   positions.  The first is that we believe monetary incentives

1    are permitted and do not make the program involuntary.

2    However, it's going to depend on what the EEOC says.  If the

3    EEOC says we have to look at the, you know, wage levels of

4    the individuals involved and how burdensome this is for them,

5    as some commenters have proposed, that would fundamentally

6    alter the inquiry, which is, again, why we think this should

7    be deferred.

8            We do think that there was a substantial discovery

9    aspect --

10           THE COURT:  But what if the EEOC wasn't about to act

11   and you just had to litigate this case.  What discovery would

12   you want before moving for partial summary judgment on the

13   question of voluntary?

14           MS. RINEHART:  We have certain arguments that we

15   could make without discovery.  All arguments could not be

16   made without significant discovery, including discovery into

17   absent class members.

18           THE COURT:  Say that part again.

19           MS. RINEHART:  So we have a number of arguments.

20   There's a legal argument that simply says voluntary -- you

21   can have a financial incentive and it's still voluntary.

22           THE COURT:  Right.

23           MS. RINEHART:  There's also a legal argument that

24   says, you know, if the cost is less than a certain

25   threshold -- the EEOC has picked the 30 percent threshold --

1   then it's not so compelling as to be involuntary.  That's

2   another argument that could probably be disposed of rapidly.

3   They said that they could stipulate that it doesn't cross

4   that threshold.

5           But there are additional arguments, such as, for

6   these particular individuals this was voluntary; that they,

7   in fact, chose, for example, to undertake additional medical

8   exams beyond what was required.  They signed up for

9   additional coaching.  That's another way of looking at

10  voluntary, which requires us to have much more evidence.

11          THE COURT:  All right.  So it seems to me that in

12  the first instance you're going to be defending a partial

13  Motion for Summary Judgment on the issue of voluntariness as

14  they have framed the issue and why they believe

15  across-the-board this is a question of law that I can resolve

16  in their favor.  Is that where we are procedurally, you

17  think?

18          MS. RINEHART:  I think we've envisioned

19  cross-motions for summary judgment on the issues that can be

20  resolved through a legal -- just an up or down legal ruling.

21  That's what we had been discussing before it was apparent

22  that we were likely to get a regulation soon.

23          It's just our view that that process, which we think

24  is the most efficient process to get this case to resolution,

25  makes a lot more sense if we have the new regulation, because

1    then we're able to address all the periods of time that are

2    at issue.  It's going to fundamentally change the legal

3    analysis.

4         If we filed a motion to dismiss for summary judgment

5    today, we would probably need to ask for permission to refile

6    it with that guidance -- with the additional guidance.

7         THE COURT:  But as I understand the parties'

8    position, this additional guidance, they're taking the

9    position that, whatever it says, it doesn't matter; it

10   doesn't cover the time period -- a certain time period

11   alleged in the complaint.  Do I have that right?

12        MS. SMITH:  Yes, Your Honor.

13        THE COURT:  So it might be probative of the

14   arguments that are being made about the time period alleged

15   in the complaint, but their position is it's not controlling,

16   unless -- I don't know -- is it -- are they going to come out

17   and say that it's retroactive to the -- I have no idea what

18   they're going to say.  I'm sure it'll give us more things to

19   litigate, whatever they do say.

20        MS. RINEHART:  Right.  But the time period in the

21   complaint is continuing.  It's not just for that period of

22   time.  So I think the issue is simply, you know, we have

23   various periods of time that are all covered by the class.

24   Part of it is covered by the 2016 regulation, part of it

25   there's a gap, and part of it is going forward from whatever

1    the EEOC chooses to do.  And we think it's important that the

2    Court have all of that guidance before it when addressing the

3    legal issues, and we think it would be important,

4    particularly because it's going to be the going-forward rule,

5    that we are able to argue for that period of time, as well.

6             THE COURT:  So what's the -- well, what discovery

7    has occurred?  Has there been exchange of documents at all?

8             MS. SMITH:  No, Your Honor.

9             THE COURT:  And you said that there were two

10   documents you were looking for.  What are those?

11            MS. SMITH:  We would like to request the business

12   partner agreements that Yale has with its wellness vendors

13   that should describe their relationship and what they're

14   allowed to do with the health information they exchange.

15   They were named in the initial disclosures.

16            THE COURT:  And how many of those are there?  How

17   many vendor agreements are there?

18            MS. SMITH:  I am not sure, Your Honor.

19            MS. RINEHART:  It's just two vendors.  I believe

20   it's only two agreements.  It could be that there's, like, a

21   revised agreement of something.  I don't think we would have

22   a problem providing those two agreements now.  I do think

23   that doing depositions before we have guidance is really

24   inefficient, because it is very likely that the same person

25   would have to be recalled again.

1          So I would ask that, if we go forward with this

2    exchange of documents, that the depositions be deferred until

3    after the rule is promulgated.

4          THE COURT:  And what if we don't get guidance?  Are

5    we back here at the end of January having the same

6    discussion?

7          MS. RINEHART:  We can be back here at the end of

8    January, but at that point we'll obviously have somewhat less

9    confidence that the EEOC is going to act swiftly.

10          MS. SMITH:  And, Your Honor, if the EEOC does issue

11    regulations by that point, we don't really have any

12    confidence that the final rules are going to be the same as

13    the proposed rules.  Because, presumably, they will take into

14    account the comments that are submitted in response to those

15    proposed rules.  Last time, when the GINA rules, in

16    particular, were promulgated, they were significantly

17    different than the prior rule.

18          So perhaps they'll be the same, perhaps they won't.

19    But I think if the theory is that we can't do anything, we

20    can't move forward with any depositions until everything is

21    final, we're going to be waiting quite a bit longer than two

22    months.

23          THE COURT:  You indicated at this juncture the only

24    deposition you want in advance of your motion is a

25    30(b)(6) -- you want those documents and a 30(b)(6),

1   basically on that relationship and those documents?

2           MS. SMITH:  Yes, Your Honor.

3           THE COURT:  Well, I think as a practical matter it

4   may be the end of January before anybody's in a position to

5   advance any particular legal theory, but I don't think I've

6   heard sufficient reason to just stall -- and that's not the

7   right word.  That has a pejorative sense to it and that's not

8   what I meant -- but to forestall or to put everything on hold

9   or to stay the litigation pending the issuance of these new

10  regs.

11          But I take Plaintiffs at their word.  I am going to

12  ask that, in the course of -- that Yale provide these vendor

13  agreements, the two vendor agreements for their wellness plan

14  -- wellness program, and that I will permit the Plaintiff to

15  issue a Rule 30(b)(6) Notice of Deposition with respect to

16  that program, those vendors, that relationship and those

17  documents.

18          But we will set -- and at that point, obviously

19  you're going to file whatever you're going to file, and

20  you'll litigate, and the Court will decide, in due course,

21  whatever issues are joined for the Court's determination.

22          Other than that discovery, I think that we should

23  set dates that, hopefully, will take into account the

24  pendency of these regulations.  You had originally talked

25  about or agreed upon a 10-month time period for fact

1    discovery.  If I'm going to limit discovery between now and

2    the end of January to that which I've just identified, if I

3    go 10 months from that, that would be the end of November,

4    2020.  Is that a reasonable date for fact discovery?

5            MR. GOODBAUM:  May I have just one moment to confer,

6    Your Honor?

7            THE COURT:  Yes.

8            MR. GOODBAUM:  So, Your Honor, in the interest of

9    continuing to try to promote efficiency in the resolution of

10   this dispute, what we think would be best is to have an

11   answer from the Court on the issue of voluntariness and how

12   it should be interpreted before we move forward with more

13   intensive fact discovery.

14           THE COURT:  And is that going to be an issue that is

15   limited to a particular time period?  I mean, if we're about

16   to get regs that tell me what voluntariness is, aren't I just

17   issuing it for the time period for which there's a gap?

18           MR. GOODBAUM:  You could be.  Again, this is sort

19   of -- this is sort of back to -- in any event, you would

20   certainly be issuing a ruling for the time period that we're

21   currently in, until that new reg, if it's ever issued,

22   becomes final.  It might be that the new reg provides so

23   little guidance that the Court would also be issuing a

24   judgment as a matter of law with respect to just how to

25   interpret the statute or what the old regs -- what the import

1   of the old regs was.

2        THE COURT:  It would be very unlike me to proceed on

3   a case in such a piecemeal fashion, Counsel.  While it may be

4   efficient in some respects -- certainly for the parties, I

5   understand that -- I don't generally pause litigation while

6   issues that may be quite informative of the outcome of the

7   case are being decided.

8        So I'm going to, I think, deny that request without

9   prejudice.  Let's set a case management plan.  And once these

10  motions are filed, maybe it'll be appropriate at the time to

11  revisit the case management plan, depending on what those

12  issues look like.

13       MR. GOODBAUM:  Yes, Your Honor.

14       MS. RINEHART:  Your Honor, the only thing I would

15  add, and I understand that you're reserving on that issue, is

16  that this is a very unique case in which the class members

17  are -- it involves class member health information, HIPAA,

18  protected information.  And, so, I do want to just second the

19  point that the parties would benefit from waiting until

20  there's guidance before undertaking any kind of private

21  discovery.

22       So I understand that we can take that back up at the

23  relevant time.  But at the same time, you know, they may feel

24  pressure to go forward, and we may feel pressure to go

25  forward with class-related discovery, which involves

1    protected health information.  So I just wanted to be clear

2    on that.

3         THE COURT:  So it's Yale's position that, as a

4    matter of law, this program that's outlined --

5    notwithstanding there were no regs in place, during at least

6    a portion of the time period in question -- that, as a matter

7    of law, they were voluntary across-the-board?

8         MS. RINEHART:  That's certainly one of our

9    arguments, Your Honor.

10        THE COURT:  Because I thought I heard an argument

11   that voluntariness was going to come down to an

12   individualized assessment.

13        MS. RINEHART:  Our argument is that our program is

14   voluntary.  Whether it is judged on a standard that says

15   monetary incentives simply don't make something involuntary,

16   which case law supports; whether it is judgement under the

17   EEOC's old rule that said monetary incentives up to a certain

18   threshold are fine; or whether it is judged under some other

19   standard, which we don't know yet, but which they seem to

20   argue in their complaint by including lots of examples of

21   people and saying it's hard for them to pay.

22        So we have obviously legal arguments that do not

23   come down to that.  The thrust of our legal arguments are

24   that it should not come down to that.  But even, for

25   example -- I mean, in terms of what evidence would be

1    required, there are individuals participating in this

2    program.  They are trying to assert claims on behalf of them

3    as a class.  We would have to understand, What are their

4    damages?  They have gone voluntarily to medical examinations.

5    Some of them have gone beyond the required number of medical

6    examinations because they find them helpful, the health

7    coaching.  Is that really an involuntary choice?  What kind

8    of damages did they suffer?  So...

9         THE COURT:  That's my point.  How do I decide this

10   out of the box?  It doesn't make any sense to me.  If you

11   agreed on a single identifiable legal issue.  But you don't.

12   You disagree on what the issue is going to look like when

13   it's presented to me.  Ultimately, the view from 10,000 feet,

14   it's the same issue:  Is this plan voluntary?  But you're

15   talking past each other in terms of what the Court is going

16   to be asked to decide.

17        MS. RINEHART:  I think in large measure, Your Honor,

18   it's because we don't have the benefit of the EEOC's

19   guidance.  So I think we're both saying that we have

20   positions that can be resolved up or down as a matter of law.

21        MR. GOODBAUM:  Uh-huh.

22        MS. RINEHART:  But if those positions are rejected,

23   which they could be, we have other positions that require

24   other types of evidence.  And that's why I think both of us

25   are standing here saying to Your Honor that understanding

1   whether the up or down legal arguments are accepted or not

2   will fundamentally transform what discovery, if any, is

3   required, especially into a protected class's health

4   information.

5          MR. GOODBAUM:  I want to be clear, Your Honor.  We

6   do litigate cases involving protected health information all

7   of the time.  We do it with redactions.  We do it with

8   protective orders.  We're not concerned about our ability to

9   do that.  We don't think we need any of that PHI to brief the

10  initial question.

11         It seems to me the initial question has three

12  potential outcomes:  Either the Court agrees with the

13  Plaintiffs and says across-the-board voluntary means no

14  incentive; or the Court agrees with the Defendant and says

15  incentive is irrelevant -- it can be voluntary with an

16  incentive; or the Court says -- or it's something in the

17  middle.

18         And what the Court decides between those three

19  buckets is going to impact how much discovery we need to

20  proceed with the case.  We think that the case proceeds

21  regardless of what the answer is to those three things,

22  but -- or regardless of which choice the Court chooses among

23  those three options, but it will frame the scope of

24  discovery.

25         You could deny both motions for summary judgment,

1    right -- both motions for partial summary judgment, and say,

2    Go do more discovery, I need to see more.

3          THE COURT:  So I take it this plan developed after

4    the Rule 26(f) was filed?

5          MR. GOODBAUM:  It's been in -- we have been in

6    conversation about how to litigate this case -- we had

7    multiple 26(f) conferences.  We've been in conversation about

8    how to litigate this case for a couple months, I think, and

9    in good faith and with a cooperative spirit.  But it's not

10   easy to figure out how to litigate a case with this many

11   moving pieces.

12          We, the -- Plaintiffs' counsel think the best way to

13   do it is what the Court has ordered, which is to allow a very

14   limited set of discovery and then to file a motion for

15   partial summary judgment.  And if the Court agrees with us

16   about what the rules should be, then we would then move

17   forward with more intensive fact discovery, but more targeted

18   toward what the Court has said.

19          THE COURT:  If I understood Yale correctly, they

20   want to move -- they want to cross-move on the same issue,

21   but they want the benefit of the newly promulgated

22   regulations to do that.  So we're talking about briefing an

23   issue that will perhaps define the parameters of the

24   discovery and litigation going forward -- we could be

25   briefing into June.  I mean, you're going to be a year into

1   this case and not have done anything other than the discovery

2   I just allowed.  If you want to do that, if that's the

3   agreement -- but it's hard to overlay urgency to a plan like

4   this, as a practical matter.

5           MS. RINEHART:  I think it's a very unique case.  It

6   really is impact litigation, testing a very particular issue

7   that impacts employers nationwide.  We think under the

8   circumstances it makes sense to do it in this fashion.  I

9   think the Plaintiffs agree.  Obviously Your Honor gets to set

10  the case plan.

11          THE COURT:  All right.  So why don't we do this,

12  because I was working off a 26(f) report that is, for lack of

13  a better term, "stale" at this point.  Why don't I ask you --

14  because you obviously are discussing it, you're working

15  together, and it probably makes more sense for you all to

16  confer again and send me or file a supplemental proposed case

17  management plan.  And if that includes briefing schedules,

18  discovery schedules, orders for summary judgment, partial

19  summary judgment, class certification, however you want to

20  sort of structure the litigation, have the conversation that

21  makes the most sense to both of you, send that in as a

22  supplemental, or however you want to phrase it.  And if it

23  doesn't do violence to my case management, I will, in all

24  likelihood, accept it and issue it as the Rule 16 or as the

25  case management plan in this case.

```
 1            If there are sticking points in the course of that
 2   conference, just indicate that as you normally would in a
 3   26(f) -- we think this, the Plaintiff thinks this, Defense
 4   thinks this -- and I will resolve those on the papers,
 5   depending on what you submit.  That seems to be the most
 6   efficient thing to do at this juncture.
 7            MS. RINEHART:  That makes great sense, Your Honor.
 8            THE COURT:  All right.  Any objection to proceeding
 9   in that fashion?
10            MR. GOODBAUM:  We're fine proceeding in that way,
11   and we will, in the meantime, issue the very targeted
12   discovery requests and the 30(b)(6) notice that the Court's
13   authorized.
14            THE COURT:  All right.  Then, is there anything else
15   we can do this afternoon?
16            MR. GOODBAUM:  Not for the Plaintiffs, Your Honor.
17            THE COURT:  For the Defense?
18            MS. RINEHART:  No, Your Honor.
19            THE COURT:  All right.  Thank you, Counsel.
20            We're in recess.
21            (Proceedings concluded, 2:56 p.m.)
22
23
24
25
```

```
 1              COURT REPORTER'S TRANSCRIPT CERTIFICATE

 2    I hereby certify that the within and foregoing is a true and

 3    correct transcript taken of the proceedings in the

 4    above-entitled matter.

 5

 6                              /s/  Tracy L. Gow
                                Tracy L. Gow, RPR
 7                              Official Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```