# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

_____
                                        :
LISA KWESELL; CHRISTINE                 :
TURECEK; AND JASON SCHWARTZ,            :          Civil action no.:
individually and on behalf all others   :          3:19-cv-01098 (KAD)
similarly situated,                     :
                                        :
              Plaintiffs,               :
                                        :
v.                                      :
                                        :
YALE UNIVERSITY,                        :
                                        :
              Defendant.                :          April 29, 2020
_____ :


## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF NO. 44) AND IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND/OR TO DISMISS IN PART FOR LACK OF STANDING

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 4

    A.    Workplace Wellness Programs with Incentives: A Common Approach to
           Tackling Preventable Disease Among Employees............................................................ 4

    B.    The Long History of Workplace Wellness Programs and Their Regulation .................. 5

        1.    *The ADA, HIPAA, and GINA Become Law* ............................................................. 5

        3.    *The Affordable Care Act (ACA)*................................................................................. 7

        4.    *EEOC's Position*........................................................................................................ 8

    C.    Yale's Health Expectations Program ......................................................................... 10

        1.    *The Collective Bargaining Agreement Adopting the HEP* ..................................... 10

        2.    *Administration of Yale's Group Health Plan Including the HEP* ........................... 12

    D.    AARP Challenges the 2016 Rules, and then Files this Lawsuit ................................. 16

ARGUMENT ................................................................................................................... 18

I.    Plaintiffs' ADA Claims (Counts I and II) Lack Merit. ................................................ 18

    A.    The ADA Does Not Forbid Unions from Including Wellness Program
           Incentives in a Collectively Bargained Voluntary Benefits Package............................ 19

    B.    The $25 Incentive Does Not Change a Voluntary Choice into an
           Involuntary Action. ..................................................................................................... 22

        1.    *The Plain Meaning of "Voluntary" Is "By Choice," Not "Severed from
             Financial Consideration."*........................................................................................ 23

        2.    *Caselaw Supports the Plain Meaning of "Voluntary" as "By Choice,"
             Not "Severed from Financial Consideration."* ....................................................... 25

        3.    *The Statutory and Regulatory Context Shows That Incentives Don't Make
             Voluntary Choices into Involuntary Actions.* .......................................................... 31

    C.    The Program Is Voluntary Under the 2016 Rules, Which Govern the 2017 and
           2018 Plan Years. ........................................................................................................ 37

II.    Yale Is Entitled to Dismissal or Summary Judgment on the GINA Claims (Counts III
       and IV). ........................................................................................................................ 39

    A.    Plaintiffs Lack Standing to Bring the GINA Claims................................................... 40

    B.    The GINA Claims Fail as a Matter of Law. ............................................................... 42

        1.    *Plaintiffs and Their Unions Voluntarily Agreed to Both Health Coaching and
             Claims Data Monitoring.*......................................................................................... 43

i

2.    *HealthMine's Monitoring of Claims Data Complies with HIPAA and Doesn't Violate GINA.* ............................................................................................ 43

3.    *There Is No GINA Violation Based on Spousal Health Coaching.* ........................... 47

4.    *GINA Provides No Private Damages Action for Plaintiffs' Claims.* .......................... 50

CONCLUSION ............................................................................................................................ 51

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*14 Penn Plaza LLC v. Pyett*,
  556 U.S. 247 (2009)..........................................................................................20, 22

*A.L. Pharma, Inc. v. Shalala*,
  62 F.3d 1484 (D.C. Cir. 1995)....................................................................................39

*AARP v. EEOC*,
  226 F. Supp. 3d 7 (D.D.C. 2016) ....................................................................... *passim*

*AARP v. EEOC*,
  267 F. Supp. 3d 14 (D.D.C. 2017)...............................................................16, 38, 49

*AARP v. EEOC*,
  292 F. Supp. 3d 238 (D.D.C. 2017).............................................................17, 38, 49

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993)....................................................................................38

*Am. Hosp. Ass'n v. Azar*,
  385 F. Supp. 3d 1 (D.D.C. 2019)................................................................................39

*Arkema Inc. v. EPA*,
  618 F.3d 1 (D.C. Cir. 2010)........................................................................................37

*Balestracci v. Gen. Dynamics Corp.*,
  221 F. Supp. 2d 258 (D. Conn. 2002)........................................................................22

*Barnard v. Lackawanna Cty.*,
  696 F. App'x 59 (3d Cir. 2017) ..................................................................................20

*Bolden v. Se. Pa. Transp. Auth.*,
  953 F.2d 807 (3d Cir. 1991) (*en banc*) .....................................................................20

*Brown v. N.Y.C. Transit Auth.*,
  112 F.3d 503 (2d Cir. 1996)........................................................................................20

*DiMartino v. City of Hartford*,
  636 F. Supp. 1241 (D. Conn. 1986)............................................................................28

*Disciplinary Counsel v. Hickey*,
  No. FSTCV084014896S, 2016 WL 4543178 (Conn. Super. Ct. Aug. 5, 2016),
  *aff'd*, 328 Conn. 688 (2018)......................................................................................29

*Doe v. John Doe Corp.*,
    960 F.2d 318 (2d Cir. 1992)..........................................................................................30

*EEOC v. Orion Energy Systems, Inc.*,
    208 F. Supp. 3d 989 (E.D. Wis. 2016)....................................................................26, 27

*FDA v. Brown & Williamson Tobacco Co.*,
    529 U.S. 120 (2000)....................................................................................................37

*Fertilizer Inst. v. EPA*,
    935 F.2d 1303 (D.C. Cir. 1991) ..................................................................................38

*Florida v. Royer*,
    460 U.S. 491 (1983)....................................................................................................28

*Ford Motor Co. v. Huffman*,
    345 U.S. 330 (1953)....................................................................................................20

*Gallipeau v. Correct Care Sols.*,
    No. CIV.A. 3:10-2017-JFA, 2011 WL 4502062 (D.S.C. Aug. 5, 2011)................................45

*Glaser v. Wound Care Consultants, Inc.*,
    570 F.3d 907 (7th Cir. 2009) .......................................................................................30

*Griffith v. Conn*,
    No. CIV. 11-157-ART, 2015 WL 779047 (E.D. Ky. Feb. 24, 2015) ....................................30

*Heartland Reg'l Med. Ctr. v. Sebelius*,
    566 F.3d 193 (D.C. Cir. 2009) ....................................................................................38

*Heston v. Underwriters Labs., Inc.*,
    297 F. Supp. 2d 840 (M.D.N.C. 2003) ........................................................................21

*Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*,
    655 F.3d 136 (2d Cir. 2011)........................................................................................27

*Katz v. Donna Karan Co., LLC*,
    872 F.3d 114 (2d Cir. 2017)........................................................................................42

*Kosakow v. New Rochelle Radiology Assocs., P.C.*,
    274 F.3d 706 (2d Cir. 2001)...................................................................................30, 31

*Langan v. Johnson & Johnson Consumer Cos.*,
    897 F.3d 88 (2d Cir. 2018)..........................................................................................24

*Lindsay v. Ass'n of Prof'l Flight Attendants*,
    581 F.3d 47 (2d Cir. 2009)..........................................................................................20

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)......................................................................................................40

*McIntosh v. Walgreens Boots All., Inc.*,
    135 N.E.3d 73 (Ill. 2019)............................................................................................29

*Mericle v. Jackson Nat'l Life Ins. Co.*,
    193 F. Supp. 3d 435 (M.D. Pa. 2016).........................................................................29

*Mount Royal Joint Venture v. Kempthorne*,
    477 F.3d 745 (D.C. Cir. 2007).....................................................................................35

*Nat'l R.R. Passenger Corp. v. Morgan*,
    536 U.S. 101 (2002).....................................................................................................25

*Nation-Bailey v. Bailey*,
    316 Conn. 182 (2015)...................................................................................................27

*NRDC v. EPA*,
    808 F.3d 556 (2d Cir. 2015).........................................................................................38

*Orton Motor, Inc. v. U.S. Dep't of Health & Human Servs.*,
    884 F.3d 1205 (D.C. Cir. 2018)...................................................................................36

*Paranich v. Sorgnard*,
    396 F.3d 326 (3d Cir. 2005).........................................................................................30

*Provance v. Gallatin Cty.*,
    No. CV-13-S1-BU-SEH, 2015 WL 1810307 (D. Mont. Apr. 17, 2015)......................27

*Richards v. City of Topeka*,
    173 F.3d 1247 (10th Cir. 1999) ...................................................................................21

*Rzayeva v. U.S.*,
    492 F. Supp. 2d 60 (D. Conn. 2007)............................................................................46

*Schmerber v. California*,
    384 U.S. 757 (1966).....................................................................................................28

*Schneckloth v. Bustamonte*,
    412 U.S. 218 (1973)...............................................................................................28, 29

*Spencer v. N.Y.C. Transit Auth.*,
    No. 95-CV-4779 (JG), 1999 WL 51814 (E.D.N.Y. Jan. 14, 1999).............................20

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016)............................................................................................40, 42

*St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*,
  357 F. Supp. 3d 30 (D.D.C. 2019) ....................................................................39

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002) ...........................................................................38

*Susquehanna Int'l Grp., LLP v. SEC*,
  866 F.3d 442 (D.C. Cir. 2017) ..........................................................................38

*U.S. v. Doe*,
  537 F.3d 204 (2d Cir. 2008)..............................................................................29

*U.S. v. Drayton*,
  536 U.S. 194 (2002) ..........................................................................................28

*U.S. v. Haak*,
  884 F.3d 400 (2d Cir. 2018) ...........................................................18, 29, 37

*U.S. v. Harris*,
  838 F.3d 98 (2d Cir. 2016).................................................................................34

*Umpqua Bank v. First Am. Title Ins. Co.*,
  No. CIV. 2:09-3208 WBS, 2011 WL 4852229 (E.D. Cal. Oct. 12, 2011), *aff'd*,
  542 F. App'x 635 (9th Cir. 2013) ....................................................................18

*United Steelworkers of Am., AFL-CIO-CLC v. Rawson*,
  495 U.S. 362 (1990)...........................................................................................21

*Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.*,
  639 F. Supp. 2d 371 (S.D.N.Y. 2009)...............................................................46

*Weisman v. Kaspar*,
  233 Conn. 531 (1995) ...................................................................................27, 29

*Wisc. Res. Prot. Council v. Flambeau Min. Co.*,
  727 F.3d 700 (7th Cir. 2013) ............................................................................39

**Statutes**

18 U.S.C. § 1584..................................................................................................28

26 U.S.C. § 9802....................................................................................................6

29 U.S.C. § 1002.............................................................................................12, 44

29 U.S.C. § 1182....................................................................................................6

42 U.S.C. § 300gg-4......................................................................................6, 8, 34

42 U.S.C. § 1981a ...........................................................................................50

42 U.S.C. § 2000ff .......................................................................................7, 40

42 U.S.C. § 2000ff-1 ................................................................................ *passim*

42 U.S.C. § 2000ff-5 ................................................................................ *passim*

42 U.S.C. § 2000ff-6 ........................................................................................50

42 U.S.C. § 12112 ..................................................................................... *passim*

**Regulations**

26 C.F.R. § 54.9802-1 .......................................................................................6

29 C.F.R. § 1630.14 .....................................................................................9, 32

29 C.F.R. § 1635.8 ..........................................................................................49

29 C.F.R. § 1635.10 ........................................................................................50

29 C.F.R. § 1635.11 ...................................................................................44, 45

29 C.F.R. § 2510.3-16 ................................................................................12, 44

29 C.F.R. § 2590.702 ........................................................................................6

45 C.F.R. § 146.121 .......................................................................................6, 7

45 C.F.R. § 164.501 ...................................................................................44, 45

45 C.F.R. §§ 164.502 .................................................................................12, 44

45 C.F.R. § 164.504 ...................................................................................12, 44

45 C.F.R. § 164.506 ........................................................................................44

**Agency Statements**

66 Fed. Reg. 1,421 ............................................................................................6

71 Fed. Reg. 75,014 .....................................................................................6, 35

75 Fed. Reg. 68,912 ........................................................................................45

78 Fed. Reg. 33,158 ..........................................................................................8

80 Fed. Reg. 21,659 ...................................................................................10, 35

80 Fed. Reg. 66,853 ...........................................................................................10, 49

81 Fed. Reg. 31,126 ..................................................................................... *passim*

83 Fed. Reg. 65,296 ....................................................................................17, 37, 49

Tr. of Open Session, *Wellness Programs Under Fed. Equal Employment Opportunity Laws*, EEOC (May 8, 2013) ...........................................8, 35

*Enforcement Guidance: Disability-Related Inquiries & Med. Examinations of Employees Under the [ADA]*, EEOC (July 27, 2000) ........................................9, 35

Letter, *ADA: Disability-Related Inquiries and Med. Exams.; Health Risk Assessment*, EEOC (Mar. 6, 2009)...........................................................9, 35

Statement, *EEOC's Final Rule on Employer Wellness Programs and Title I of the [ADA]*, EEOC (2016)..............................................................................9

Guidance, *Bus. Assocs.*, U.S. Dep't of Health & Human Servs. ..................................44

*Guidance: Treatment, Payment, & Health Care Operations*, U.S. Dep't of Health & Human Servs. ......................................................45

**Legislative History**

H.R. Rep. 110-28(I), House Comm. on Educ. & Labor (Mar. 5, 2007)...........................39, 40, 42

S. Rep. 110-48, Sen. Comm. on Health, Educ., Labor, & Pensions (Apr. 10, 2007)..................40

**Other Authorities**

Black's Law Dictionary (11th ed. 2019).........................................................25

Concise Oxford English Dictionary (12th ed. 2011) ......................................25

Merriam-Webster's Dictionary and Thesaurus (2014 ed.) ...........................25

Merriam-Webster.com .....................................................................................25

*Findings from 2015 EBRI/Greenwald & Associates Consumer Engagement in Health Care Survey*, Employee Benefits Research Inst. (2015)...................................4

*Consumer Engagement in Health Care*, Employee Benefit Research Inst. (2018)......................4

*Healthy People 2000: National Health Promotion and Disease Prevention Objectives*, Pub. Health Serv. (1990)..........................................................5

*1992 National Survey of Worksite Health Promotion Activities: Summary Report*, Pub. Health Serv. (1992)..........................................................5

*Frequency of Worksite Health Promotion Activities*, J. Fielding & P. Piserchia,
  79 Am. J. Pub. Health 16 (1989)..............................................................................7

*Text: Obama's Speech on Health Care Reform*, N.Y. Times (June 15, 2009) ..............................7

R. Pear, *Congress Plans Incentives for Healthy Habits*, N.Y. Times (May 9, 2009).....................7

*Workplace Wellness Programs Can Generate Savings*, K. Baicker et al.,
  Health Affairs, vol. 29, no. 2 (Feb. 2010) .........................................................................8

## <u>INTRODUCTION</u>

Free healthcare is virtually unheard of these days. Yet Yale University ("Yale") offers union employees health coverage with no premium cost, no deductible cost and almost no out-of-pocket costs. This benefit is highly valued by employees. That is why, during the last bargaining cycle, when Yale recommended including an employee contribution to address rising healthcare costs, Yale's two largest unions proposed an alternate solution: a "workplace wellness program." Such a program—which would include routine preventative care as well as health coaching for certain individuals—could improve employee health and lower long-term health care costs. Yale and the unions agreed to a new health benefits package effective January 1, 2017, which retained virtually cost-free healthcare coverage for union employees and included a new employee wellness program known as the "Health Expectations Program" ("HEP" or "Program"). The unions agreed that to encourage participation in the Program, employees who choose not to participate would pay a $25 weekly opt-out fee, an amount equal to less than 14% of the cost incurred by Yale in 2018 for an individual participant in the Yale Health Plan (and a much lower percentage of the cost of couple or family coverage). Yale did not begin actually collecting the fee until November 2018, after extensive outreach to plan participants.

At the time the agreement was reached, relevant statutes and regulations uniformly confirmed that wellness programs with moderate financial incentives like these were lawful. The 2010 Patient Protection and Affordable Care Act ("Affordable Care Act" or "ACA") explicitly endorsed employee wellness programs and provided guidance on the use of financial incentives, setting no limits on incentives for participatory programs and setting a limit of 30% of the premium cost for programs contingent on achieving a health outcome. When the ACA was enacted, the Health Insurance Portability and Accountability Act ("HIPAA") already expressly permitted the charging of differing premium costs to employees based on participation in a

wellness program. Like the ACA, it set no limit on participatory programs, and while early HIPAA regulations set a limit of 20% of cost for health-contingent programs, that limit was later revised to match the ACA's 30% limit. The Americans with Disabilities Act ("ADA") and Genetic Information Nondiscrimination Act ("GINA") had always permitted "voluntary" wellness programs, but had not explicitly addressed the use of incentives. In 2016, the Equal Employment Opportunity Commission ("EEOC") adopted regulations to make explicit that incentives of up to 30% of premium cost were permissible under the ACA and GINA and did not render them involuntary. Thus, at the time that Yale and the unions reached their agreement, the legal landscape clearly provided that incentives of up to 30% of premium cost were permissible. The EEOC's regulations were later withdrawn, effective January 2019, after a judge in the federal District Court for the District of Columbia found procedural flaws in the rulemaking process. That court expressly found that the rules should not be invalidated retroactively. The EEOC has announced that it will issue new regulations soon.

Seeking to take advantage of this temporary regulatory gap, three union members—Plaintiffs—brought this putative class action lawsuit against Yale alleging that the HEP violates the ADA and GINA. Their lawsuit not only seeks to undo the bargain struck by the Unions on their behalf, but also would imperil thousands of workplace wellness programs nationally, including those put in place by the State of Connecticut and City of New Haven.

Plaintiffs concede that Yale's Program complies with the ACA, HIPAA, and EEOC's 2016 regulations. However, they argue that Yale's Program is unlawful under the ADA and GINA because those statutes refer to "voluntary" wellness programs and "voluntary" should be interpreted to prohibit *any* financial incentives whatsoever—even though the statutes say *nothing* about incentives. Plaintiffs' extreme and unreasonable interpretation of the term "voluntary"— which has not been adopted by a single court—must be rejected.

Yale's Program is "voluntary" under any reasonable interpretation of the word. First, the Unions (on behalf of Plaintiffs and the putative class) agreed to the HEP, including its incentive, as part of an extensive collective bargaining process. This type of bargained-for exchange, which allowed them to retain virtually free healthcare, is the epitome of voluntariness. Second, the modest incentive payment does not render an employee's choice to participate in the Program "involuntary." Third, the statutory and regulatory history supports an interpretation permitting moderate financial incentives. This history is persuasive for all periods of time, and dispositive for the pre-2019 time period. For all these reasons, Plaintiffs' ADA claim fails.

The GINA claim fails for additional reasons. GINA is aimed at protecting against discrimination based on "genetic information." Genetic information includes genetic testing and familial medical history (as family history could be used to infer genetic conditions of the employee). The HEP's requirements do not involve any genetic testing and do not ask any Program participant for any familial medical history. Plaintiffs argue, however, that GINA is violated because spouses who are members of the health plan have their data analyzed by HealthMine to determine compliance with the HEP program requirements, and because spouses may provide medical information in coaching sessions.

This novel GINA theory—which has nothing to do with discrimination or traditional genetic information—is unsustainable. First, Plaintiffs lack standing to assert this claim as they do not allege that they themselves were discriminated against or otherwise sustained any injury as the result of the HEP's alleged acquisition or disclosure of spousal medical history information. Second, the routine data analysis done in HEP is part of the routine running of a health plan, expressly permitted by HIPAA. GINA allows uses and disclosures of genetic information consistent with HIPAA, so the data analysis does not violate GINA. To the extent that Plaintiffs assert a GINA claim based on the possibility that a spouse might provide medical

information during health coaching, Plaintiffs do not even allege that their spouses underwent any health coaching. And even if they had, the spouse's choice to provide medical information to a nurse in connection with coaching, and which is not provided to the employer, does not violate GINA. Finally, there is no private right of action for damages for this type of GINA claim.

Because the Program and its modest incentives are lawful, Plaintiff's motion should be denied and Yale's motion should be granted.

## STATEMENT OF FACTS

### A.    Workplace Wellness Programs with Incentives: A Common Approach to Tackling Preventable Disease Among Employees

Employers around the country have implemented "workplace wellness programs" aimed at addressing preventable disease and the human and financial cost it brings. According to a 2015 analysis, nearly half of employer-sponsored health plans include wellness programs. Ex. A to Declaration of Jonathan Freiman ("Freiman Decl.") (*Findings from 2015 EBRI/Greenwald & Associates Consumer Engagement in Health Care Survey*, Employee Benefits Research Inst. (2015) ("2015 EBRI")), at 14. Wellness programs may incorporate a variety of components including health screenings and counseling services, smoking cessation programs and on-site clinics. Freiman Decl., Ex. B (*Consumer Engagement in Health Care*, Employee Benefit Research Inst. (2018)), at 18. Most wellness programs use financial incentives to encourage participation. 2015 EBRI, at 15-16.

Some of the largest employers in Connecticut, including the State of Connecticut and the City of New Haven, have implemented wellness programs that offer financial incentives for participation. The State's Health Enhancement Program (after which Yale's was modeled) requires participants to remain current with a schedule of eight preventive health screenings, such as a colorectal screening every ten years starting at age 50, and also requires employees

with certain chronic diseases to complete a "disease counseling and education program."

Freiman Decl., Ex. C at 3. Those not meeting the requirements or choosing not to participate are

charged an additional $100 per month in insurance premium, plus a $350 per participant annual

deductible. *Id.* The City of New Haven's Health Incentive Plan is similar, with a schedule of

preventive screenings, a "disease management program" for those with chronic health

conditions, and monthly charges of $50 for an individual, $75 for a couple, and $100 for a family

if the employee does not participate in the program. Freiman Decl., Ex. D at 86-87.

      **B.**     **The Long History of Workplace Wellness Programs and Their Regulation**

      Wellness programs that include incentives for participation have a long history in the

United States. A 1990 study by the Public Health Service ("PHS") of the U.S. Department of

Health and Human Services ("HHS") found that "63 percent of medium and large companies had

a wellness program in 1987" and that "[i]ncentives and awards for regular participation or

achievement" could "help motivate people to continue participation." Freiman Decl., Ex. E

(*Healthy People 2000: National Health Promotion and Disease Prevention Objectives*, PHS

(1990)), at 257-58; *see also id.*, Ex. F (*Frequency of Worksite Health Promotion Activities*, J.

Fielding & P. Piserchia, 79 AM. J. PUB. HEALTH 16 (1989)). Another PHS report two years later

observed that wellness programs were becoming even more common and that employers used "a

variety of incentives" to encourage participation, including "financial incentives" based on

achieving health goals. *Id.*, Ex. G (*1992 National Survey of Worksite Health Promotion

Activities: Summary Report*, PHS (1992)), at x, 23. Against that backdrop, the ADA, HIPAA and

GINA were enacted, each making clear that wellness programs were permissible.

      *1.*     ***The ADA, HIPAA, and GINA Become Law***

      The ADA became law in 1990. Aimed at prohibiting discrimination based on disability,

the ADA prohibits employers from conditioning employment on medical examinations or

inquiries. 42 U.S.C. § 12112(d)(4)(A). However, the ADA makes clear that employers can continue to "conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site," *id.* § 12112(d)(4)(B).[1]

Six years later, HIPAA was enacted. Like the ADA, it banned certain forms of discrimination but permitted employers to continue the practice of modifying an employee's plan costs "in return for adherence to programs of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2)(B). The Departments of Treasury, Labor, and HHS jointly proposed in 2001 and finalized in 2006 rules to regulate "programs of health promotion and disease prevention," i.e., wellness programs, under HIPAA. 66 Fed. Reg. 1,421 (Jan. 8, 2001); 71 Fed. Reg. 75,014 (Dec. 13, 2006).[2] They cited literature showing that "wellness programs can deliver benefits well in excess of their costs," 71 Fed. Reg. at 75,027, and that existing wellness programs included incentives of up to 23% of the premium, with the average being 11%, 66 Fed. Reg. at 1,428.

The HIPAA regulations recognize two types of workplace wellness programs: participatory programs and health-contingent programs. The regulations placed no cap on the permissible incentives for participatory workplace wellness programs, i.e., a "diagnostic testing program that provides a reward for participation and does not base any part of the reward on outcomes." *Id.* For health-contingent programs, the regulations provided that programs could offer a "reward or penalty," 71 Fed. Reg. at 75,018, up to "20 percent of the cost of [health care] coverage," conditioned on "satisfaction of a standard related to a health factor." 29 C.F.R.

---

[1]   The terms "health program" and "wellness program" refer to the same thing. *See, e.g.*, 81 Fed. Reg. 31,126, at 31,126 (May 17, 2016) (using the terms interchangeably).

[2]   HIPAA added the new provision to three different statutes, *see* 66 Fed. Reg. at 1,421: the tax code (administered by Treasury), 26 U.S.C. § 9802; 26 C.F.R. § 54.9802-1; the Employee Retirement Income Security Act (ERISA) (Labor), 29 U.S.C. § 1182; 29 C.F.R. § 2590.702; and the Public Health Service Act (HHS), 42 U.S.C. § 300gg-4; 45 C.F.R. § 146.121.

§ 2590.702(f) (version effective Feb. 2007); 45 C.F.R. § 146.121(f) (same).[3]

Congress passed GINA in 2008. GINA is a narrow statute, aimed at prohibiting discrimination based on genetic information known about an employee. 42 U.S.C. § 2000ff-1(a). "Genetic information" includes genetic testing of individuals or their family members as well as familial medical history (which might be used to deduce genetic traits of the individual). *Id.* § 2000ff(4). Under GINA, employers may not "request, require or purchase" employee "genetic information" except under limited circumstances, including for a voluntary wellness program. 42 U.S.C. § 2000ff-1(b). Like the ADA, GINA does not define "voluntary" or address financial incentives. GINA also prohibits the disclosure of genetic information except under certain circumstances. *Id.* § 2000ff-5(a). But GINA makes clear that conduct permissible under HIPAA cannot form the basis for liability under GINA. 42 U.S.C. § 2000ff-5(c).

### 3.       *The Affordable Care Act (ACA)*

In 2009, elected officials began debating the ACA. Both the President and Congress touted the success of wellness programs, which the ACA aimed to encourage further. *See* Freiman Decl., Ex. H (*Text: Obama's Speech on Health Care Reform*, N.Y. TIMES (June 15, 2009) ("Safeway workers enrolled in their 'Healthy Measures' program . . . get screened for problems like high cholesterol or high blood pressure. . . . It's a program that has helped Safeway cut health care spending by 13 percent and workers save over 20 percent on their premiums."); *see also id.*, Ex. I (R. Pear, *Congress Plans Incentives for Healthy Habits*, N.Y. TIMES (May 9, 2009) (writing that "lawmakers said they would make it easier for employers to use financial rewards or penalties to promote healthy behavior among employees" and that under current law

---

[3] For example, health-contingent programs can reward non-smokers, those keeping their weight within an established range, those maintaining certain cholesterol levels, and regular exercisers.

"rewards generally may not exceed 20 percent of the cost of coverage"). Supporting the effort was research showing that wellness programs reduced overall medical costs and "that building incentives into wellness programs helps to raise participation." *Id.*, Ex. J (*Workplace Wellness Programs Can Generate Savings*, K. Baicker et al., HEALTH AFFAIRS, vol. 29, no. 2 (Feb. 2010)) (finding that "medical costs fall by about $3.27 for every dollar spent on wellness programs").

Enacted in March 2010, the ACA ultimately codified provisions very similar in structure to the HIPAA regulations, placing no limit on the incentives for participatory programs, while raising the permissible level of incentives based on "satisfying a standard that is related to a health status factor" from 20 percent to "30 percent of the cost of the coverage." *See* Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), at Title I, § 1201; 42 U.S.C. § 300gg-4(j)(3)(A). Moreover, the ACA explicitly defined incentive "rewards" to include "the absence of a surcharge." *Id.* Following enactment of the ACA, the Departments of Treasury, Labor, and HHS modified their HIPAA regulations to raise the permissible limits for health-contingent incentives to the ACA's new 30% standard. 78 Fed. Reg. 33,158 (June 3, 2013).

### 4. EEOC's Position

Following passage of the ACA, EEOC took up the issue of wellness program incentives. During its 2013 hearings, EEOC commissioners noted that while the ACA and HIPAA regulations allowed health status incentives up to 30% of the cost of coverage, EEOC had not previously taken a position on whether the ADA or GINA limits wellness program incentives. *See* Freiman Decl., Ex. K (*Wellness Programs Under Fed. Equal Employment Opportunity Laws*, Tr. of Open Session, EEOC (May 8, 2013)).[4] Plaintiffs point to a one-sentence statement

---

[4]    Commissioner Lipnic noted that "[t]o date, the Commission ha[d] not adopted nor articulated a position on" "financial incentives within a wellness plan." Ex. K at 6. Commissioner Feldblum recognized that EEOC needed to "look at statutes as a whole and the entire body of law as a whole," including "ACA, HIPAA." *Id.* at 32. As Commissioner Barker explained, unless "we have some real

in a 2000 informal, nonbinding document, stating that employers should not "penalize[] employees who do not participate" in wellness programs, without any elaboration of that statement or discussion of incentives. *Enforcement Guidance: Disability-Related Inquiries & Med. Examinations of Employees Under the [ADA]*, EEOC (July 27, 2000), 2000 WL 33407181, at \*16. But EEOC clearly did not view that document as having set out EEOC's position on the topic of financial incentives. Indeed, in January 2009, EEOC's Office of Legal Counsel issued a "discussion letter," interpreting the ADA as consistent with HIPAA, permitting incentives up to 20% of a plan's cost. *See* Freiman Decl., Ex. L (*ADA: Disability-Related Inquiries and Med. Exams.; Health Risk Assessment*, EEOC (Mar. 6, 2009)). Though that letter was later withdrawn as having gone beyond the narrow scope of the question presented, the EEOC clarified that it still had not taken a position on how large wellness program incentives could be. *Id.*

EEOC issued its final rule on May 17, 2016 (the "2016 Rules"). The 2016 Rules stated that the ADA permits "voluntary" wellness programs to include incentives, "whether in the form of a reward or penalty," of up to 30% of the health care premium cost. 81 Fed. Reg. 31,126, at 31,140; 29 C.F.R. § 1630.14(d)(3) (effective July 2016). In passing the Rules, EEOC reiterated that it had not previously "define[d] the term 'voluntary'" or said "whether the ADA allows employers to offer incentives to encourage employees to participate in such programs." Freiman Decl., Ex. M (*EEOC's Final Rule on Employer Wellness Programs and Title I of the [ADA]*, EEOC).

The 2016 Rules also governed the application of GINA to employee wellness programs. EEOC reported receiving comments noting uncertainty as to whether GINA permits incentives

---

good science behind coming up with something other than 30 percent," it would be needlessly confusing to hold employers to two different standards under the ADA and ACA. *Id.* at 22.

for an employee's spouse to disclose their medical history as part of a wellness program, when the spouse is enrolled in the same health plan as the employee. 80 Fed. Reg. 66,853, at 66,855 (Oct. 30, 2015). EEOC "clarif[ied] that GINA does not prohibit employers from offering limited inducements (whether in the form of rewards or penalties avoided) for the provision by spouses . . . of information about their current or past health status." *Id.* Like the new ADA rules, the GINA rules adopted 30% of the total health care plan cost as the limit on incentives. 81 Fed. Reg. 31,143, at 31,158 (May 17, 2016) (GINA); 29 C.F.R. § 1635.8(b)(2)(iii) (GINA) (version effective July 2016).

EEOC noted that the new regulations generally were consistent with existing law under HIPAA and the ACA, but that they diverged in one respect: the 30% incentive limit would apply to all wellness programs involving medical exams or disability-related inquiries, including purely participatory programs. 80 Fed. Reg. 21,659, at 21,663; 21,665 (April 20, 2015).

### C.     Yale's Health Expectations Program

#### 1.     *The Collective Bargaining Agreement Adopting the HEP*

Against this regulatory backdrop, two unions representing Yale employees, Unite Here Local 34 and Local 35 (the "Unions"), were negotiating a new collective bargaining agreement with Yale. Penney Decl. ¶¶ 2-6; Local Rule 56(a)(2) Statement ("R56") ¶ 6. Preserving health coverage with no employee premium contribution and almost no out-of-pocket cost to Union members was critical to the Unions. Penney Decl. ¶ 5. Amid discussions of the ever-rising costs of health care and in response to Yale's request that employees make a premium contribution, Union leadership proposed the HEP as an alternative method to reduce costs. *Id.* ¶ 3. The Union brought forward the State's own wellness program, which included a specific set of required health actions, health coaching for certain individuals, and monetary incentives for participation, as an example and potential model for the program. *Id.* ¶ 4. Yale ultimately agreed to include the

HEP in lieu of employee premium contributions. *Id.* ¶ 6.

The Unions and Yale specifically negotiated and agreed to the requirements of the HEP, which include basic preventive care and screenings, specifically: visiting a primary care doctor every two or three years (depending on age), cholesterol and diabetes screenings every five years beginning at age 40, a colonoscopy every 10 years beginning at age 50, and one pneumococcal vaccine after age 65; and for female participants, a Pap smear every three years and mammogram every two years beginning at age 50. Penney Decl. ¶ 16; R56 ¶ 14. Yale and the Unions also agreed that participants would be referred for up to three hours of health coaching a year if they have certain specified chronic conditions: diabetes, heart disease, hyperlipidemia, COPD, heart failure, or hypertension, in combination with other risk factors (such as a high number of ER visits). Penney Decl. ¶ 20; R56 ¶ 24. To incentivize participation, the Unions and Yale agreed that employees who elect not to participate or do not fulfill the HEP criteria are charged a $25 weekly opt-out fee. Penney Decl. ¶ 14. This modest incentive amounted to less than 14% of the premium cost in 2018 for self-only coverage under the Yale Health Plan (less than 5% of cost for family coverage) and less than 12% of the premium for self-only coverage under the Aetna Select Plan (less than 4% for family). *Id.* ¶ 15.  The incentive cost represented even smaller percentages in later years, when premium costs rose.  *Id.*

Union membership voted to ratify the HEP, and it went into effect on January 1, 2017. Freiman Decl., Ex. N at YU-00000097. Under the new CBA, Union members pay ***no*** premium, ***no*** deductible, and almost no copayments for the Yale Health Plan. *Id.* at YU-00000113 (setting employee premium contributions at $0 for Yale Health); *id.* at YU-00000115 (setting no deductible, no coinsurance, and copays only for prescriptions and emergency room visits). By comparison, under the average group health plan in Connecticut in 2018, an employee paid a $1,672 premium (23% of the total cost) for self-only coverage, had a $2,322 self-only deductible

and $7,816 in potential out-of-pocket costs. *See id.*, Ex. O (*Conn. Trends in Empl'r Ins. Costs, 2008-2018*, The Commonwealth Fund (Nov. 21, 2019)).

### 2.     Administration of Yale's Group Health Plan Including the HEP

Yale offers health coverage to its employees through the Yale Group Health Plan (YGHP), an "employee welfare plan" under ERISA. Penney Decl. ¶ 28. YGHP offers multiple benefits options, including the "Yale Health Plan," which is similar to an in-house HMO, and the Aetna Plan, which utilizes Aetna's provider network. *Id.* ¶ 29.[5]

Under ERISA, an employer "sponsor" of a health program may "administer" the program themselves or designate a third-party administrator. 29 U.S.C. § 1002(16); 29 C.F.R. § 2510.3-16. If an employer administers the plan, then HIPAA requires that the employer separate its employer function from its plan administration function, 45 C.F.R. § 164.504(f), and it permits plan administrators to delegate management functions to contractors through written "business associate agreements" ("BAAs") that commit the contractors to HIPAA's privacy rules. 45 C.F.R. §§ 164.502(e), 164.504(e).

Yale self-administers the YGHP, and those involved in plan administration maintain a strict wall (the "HIPAA wall") of separateness from those involved in Yale's employment function. Penney Decl. ¶¶ 31, 41. Individuals' health status is not disclosed to anyone at Yale other than the walled-off YGHP administrators in their plan administration role. *Id.* As plan administrator, Yale also works with outside contractors to perform certain health plan functions pursuant to HIPAA business associate agreements. *Id.* ¶¶ 13, 21, 32, 42.

HEP is part of the YGHP, and participation is simple and seamless for plan participants.

---

[5]     To avoid confusion, it is worth reiterating that YGHP is the ERISA "plan" that includes Yale Health Plan enrollees and Aetna Plan enrollees. Yale Health Plan is not an ERISA plan but the name for one of the benefit options available under the YGHP ERISA plan. Penney Decl. ¶ 29.

Union members and their spouses who elect to participate in the YGHP (either via the Yale Health Plan or the Aetna Plan) are automatically enrolled in the HEP as part of their health plan. *Id.* ¶ 10; R56 ¶¶ 8-9. Union members or spouses who choose not to participate in the Yale-sponsored health plan are not enrolled in the HEP. Penney Decl. ¶¶ 11-12. Any employee or participating spouse who wishes to opt-out of the HEP may do so affirmatively. *Id.* ¶ 27. If they do, they will pay the $25 weekly opt-out fee and will not be required to complete any health actions, nor will they be reminded to do so. *Id.*[6] If a plan member does not affirmatively opt-out but fails to timely complete a health action, that individual will be opted-out of the Program effective the following quarter. *Id.* ¶¶ 24-26, 33. If that individual later completes the action, that individual will be automatically opted back in and cease paying the opt-out fee the next quarter. *Id.* While the Program was agreed to as of January 1, 2017, extensive outreach was conducted with participants, and they were given until October 2018 to complete their initial health actions. *Id.* ¶¶ 8-9, 24. The Program's first payroll deductions occurred in November 2018. *Id.* Since then, Program participation status has been determined quarterly. *Id.* ¶¶ 24-26.

Individuals who wish to participate in the HEP, but for whom a particular health action is inapplicable (e.g., a mammogram for a woman with a prior mastectomy) or not appropriate (e.g., due to a doctor's contrary advice) or who object to taking an action for religious or other reasons, may request an exemption from the requirement or a reasonable alternative, such as health coaching. *Id.* ¶ 13. These requests are reviewed on an individual basis. *Id.* If a Union member or enrolled spouse obtains an exemption from the requirement, that means that noncompletion of that requirement will not result in a payroll deduction. *Id.*

---

[6]   Their data remains subject to analysis by HealthMine because HealthMine analyzes all participant data as part of its plan administrative function for YGHP. *Id.* ¶ 38.

Pursuant to HIPAA-compliant business associate agreements, Yale (as plan administrator) has retained HealthMine and TrestleTree to assist in the administration of the HEP.[7] HealthMine administers the online portal where HEP participants can check their status, see upcoming health actions that may be due and review health-related literature. *Id.* ¶ 23. HealthMine also mails reminders to employees about upcoming due dates (using the minimum necessary information and referring them to the portal for details). *Id.* ¶ 39. Additionally, HealthMine analyzes YGHP's claims data and claims-equivalent data to determine whether employees have completed their health actions and to identify high-risk individuals who could benefit from health coaching. *Id.* ¶ 33. HealthMine does not have access to any claims data from outside YGHP. Rather the data accessed by HealthMine is merely a subset of the data that the health plan already maintains for plan administration purposes. *Id.* ¶ 36. The only exception to this is if a participant wishes to obtain credit for a health action completed outside the YGHP, for example, an exam performed prior to employment or by a provider outside the plan. In that event, the participant may submit a Health Action Credit Form providing the information. *Id.* ¶ 37; Freiman Decl., Ex. P.

If HealthMine's data analysis identifies an individual who requires health coaching, it provides the minimum necessary information to TrestleTree for the coach to know the reason for the referral. Penney Decl. ¶ 43. The coaching is conducted by registered nurses employed by TrestleTree. *Id.* ¶ 21. Coaching can occur over the phone or in person, and TrestleTree offers after-hours appointments for anyone who cannot participate during the day. *Id.* ¶ 22. The nurse initiates contact. The conversation is generally driven by the goals of the participant. *Id.* ¶ 44.

---

[7]   Because TrestleTree had a relationship with the YGHP providing coaching and claims analysis before the HEP, HealthMine became a subcontractor to TrestleTree (though both entities have independent BAAs with Yale, as administrator of the YGHP). *Id.* ¶ 32.

The nurse may ask the questions about the individual's current medical treatment or history, but there is no obligation to share that history. *Id.* Though the nurses can help more if they know more, enrollees can discuss their health as much or as little as they want, and they can finish their required three hours a year just by listening to what the nurse has to say. *Id.* ¶¶ 44-45. In addition to providing health coaching, TrestleTree also reviews the requests for exemptions from particular HEP requirements. *Id.* ¶ 13.

Neither HealthMine nor TrestleTree provides any individual health information to anyone at Yale other than the walled-off YGHP administrators in their plan administration role. *Id.* ¶ 41. As employer, Yale is advised only whether a specific individual is or is not participating in the Program; it receives no information about individuals' health status. *Id.* HealthMine reports quarterly to Yale's payroll processing system which employees are subject to the $25 weekly deduction, with no further explanation or elaboration. *Id.* ¶ 40. Thus, Yale has no knowledge as to the reason for the deduction: it could be because an individual opted out affirmatively, or failed to fulfill a requirement of the program.

It is both common and lawful for a health plan to retain consultants like HealthMine and TrestleTree. Indeed, in October 2018, an individual sent a complaint to the Office for Civil Rights (OCR) at the Department of Health and Human Services, alleging that Yale had violated HIPAA privacy rules by contracting with HealthMine to monitor health plan data. On March 18, 2019, after reviewing the BAAs in place with HealthMine and TrestleTree, OCR issued a letter stating that it was "closing this matter" after investigating and "determin[ing] that the activities of Yale Health do not violate the [HIPAA] Privacy Rule." *See* Freiman Decl., Ex. Q; Penney Decl. ¶ 35. OCR noted that the activities were conducted in relation to a wellness program and that "[c]overed entities, including health plans, may disclose [protected health information (PHI)] to 'business associates' who help the covered entity carry out all of its health care

activities and functions." Freiman Decl., Ex. Q. It found that Yale's BAAs were HIPAA-compliant and that HealthMine's activities, "provid[ing] data processing and analysis to TrestleTree and Yale Health," were lawful. *Id.*

### D.    AARP Challenges the 2016 Rules, and then Files this Lawsuit

After the 2016 Rules went into effect, AARP—which serves as counsel for Plaintiffs here—sued EEOC, seeking to invalidate them. On substance, AARP asserted that the rules conflicted with the ADA's/GINA's "voluntariness" requirement. On process, it claimed EEOC had inadequately explained its decision. *See AARP v. EEOC*, 226 F. Supp. 3d 7, 15 (D.D.C. 2016).

The district court denied AARP's motion for a preliminary injunction. It held that neither the ADA nor GINA "directly prohibits the use of incentives in connection with wellness programs" and that "nothing in either the ADA or GINA . . . indicate[s] that the particular incentive level EEOC selected is not permitted by the statute." *Id.* at 23-24. It also observed that "'voluntary' has several definitions" and "is a matter of degree," ranging from "free from coercion" to "without valuable consideration," and that EEOC's chosen level of 30% did not conflict with the statute. *AARP v. EEOC*, 267 F. Supp. 3d 14, 28-29 (D.D.C. 2017).

The district court was dissatisfied, however, with EEOC's explanation for adopting the rules. It rejected EEOC's reliance on the goal of harmonizing the ADA with the ACA and HIPAA, finding that the 2016 Rules achieved only partial harmony: while the 2016 Rules treated health-contingent incentives the same way as ACA and HIPAA (subject to a 30% cap), they treated participation incentives differently; ACA and HIPAA put no limits on those incentives but the 2016 Rules capped them at 30%. *Id.* at 29-31. The district court also thought that EEOC had not adequately responded to concerns about affordability. *Id.* at 32-34. It found similar problems with EEOC's explanation of the new GINA rules. *Id.* at 34-37.

The district court noted that the ordinary remedy for what it saw as procedural deficiencies in the rulemaking would be to vacate the 2016 Rules and let the EEOC rewrite them. *AARP v. EEOC*, 292 F. Supp. 3d 238, 242 (D.D.C. 2017). But the court found AARP's request for vacatur "problematic" because of the "significant evidence . . . that employers need to know the regulatory incentive structure for the following year by June or July, at the latest, in order to have enough time to design their wellness plans." *Id.* at 243. A near-term vacatur would cause "nationwide disruption," and the court doubted "that employees will be able to cope with a shift in their healthcare plans on such short notice." *Id.* To avoid nationwide disruption but encourage the swift promulgation of new rules, the court "stay[ed] the effective date of its vacatur order until January 1, 2019," giving the EEOC time to rewrite the rules. *Id.* at 245.

By late December 2018, with the January 1, 2019 deadline looming, EEOC had not issued revised rules (it lacked a quorum to do so). Thus, it simply withdrew the 2016 Rules on December 20, 2018. 83 Fed. Reg. 65,296. The district court's stayed vacatur—scheduled to take place on January 1, 2019, if necessary—never occurred, and neither side ever appealed the district court decision, giving the D.C. Circuit no opportunity to review it. EEOC has announced plans to issue proposed new rules but has not yet issued them. *See* Freiman Decl., Ex. R (*Amendments to Regulations Under [the ADA]*, Office of Info. and Regulatory Affairs ("OIRA") (Fall 2019 Agenda); *id.*, Ex. S (*Amendments to Regulations Under [GINA]*, OIRA (Fall 2019 Agenda)).

Several months after the EEOC withdrew its rules, three Plaintiffs filed this suit, alleging that the Program violates the ADA and GINA. *See* ECF No. 1. They do not allege that the Program violates the 2016 Rules. They allege that the ADA and GINA prohibit the use of any financial incentive whatsoever for participation in wellness programs.

## **ARGUMENT**

Summary judgment must be granted for Yale on Plaintiffs' ADA Claims (Counts I and II) because participation in the HEP's recommended health actions is voluntary under any reasonable interpretation of the word. This Court can determine voluntariness as a matter of law on the basis of undisputed material facts. *See, e.g.*, *U.S. v. Haak*, 884 F.3d 400, 408-09 (2d Cir. 2018); *Umpqua Bank v. First Am. Title Ins. Co.*, No. CIV. 2:09-3208 WBS, 2011 WL 4852229, at *8 (E.D. Cal. Oct. 12, 2011), *aff'd*, 542 F. App'x 635 (9th Cir. 2013).

Plaintiffs' GINA claims (Counts III and IV) must be dismissed because Plaintiffs allege no injury to themselves traceable to their novel GINA theory (which involves a purported privacy violation of their non-party spouses). If Plaintiffs had standing to bring the GINA claims, summary judgment for Yale would be required for several reasons. HealthMine's data analysis is a routine a health plan administration function governed by HIPAA, with which Yale's program complies. And, to the extent that Plaintiffs' allege claims relating to disclosure of spousal history during coaching sessions, they do not even allege that their spouses participated in coaching, let alone that the HEP forces them to divulge medical history during sessions. Even if they had, this would not constitute a violation of GINA. Finally, there is no private right of action for damages for these alleged violations.

## I.     **Plaintiffs' ADA Claims (Counts I and II) Lack Merit.**

Plaintiffs' ADA claims (Counts I and II) fail because the HEP is "voluntary." First, the Unions appropriately represented their members in negotiating and entering into a collective bargaining agreement with Yale that included the Program as part of a generous health care plan. The CBA is a voluntary agreement struck by sophisticated parties. Second, a modest financial incentive does not turn a voluntary choice into an involuntary action. Plaintiffs' contention that

the $25 weekly incentive fee renders the program involuntary relies on a utopian view of voluntariness, in which people act voluntarily only when their choices are entirely "severed from financial considerations." In the real world, where Congress legislates and the ADA operates, financial considerations affect our choices all the time, influencing our decisions about where to work, where to live, and what to buy. A whole raft of legal doctrines recognizes that reality, understanding choices as voluntary even when the people making the choices face far more powerful pressures than the $25 incentive at issue here. That understanding of voluntariness accords with the ADA's antidiscrimination principles and allows the ADA to exist in harmony with the ACA and with HIPAA regulations that explicitly permit employee wellness program incentives considerably higher than those in the Program. Third, the HEP satisfied the 2016 Rules, which are dispositive as to the 2017 and 2018 plan years.

### A.   The ADA Does Not Forbid Unions from Including Wellness Program Incentives in a Collectively Bargained Voluntary Benefits Package.

The Unions, Plaintiffs' collective bargaining agents, suggested including the HEP in lieu of employee premium contributions. Yale agreed, allowing Union members to retain virtually free healthcare. The CBAs were then ratified by Union members. Plaintiffs do not allege that the Unions involuntarily entered into the CBAs, and they do not allege that Yale has failed to honor its commitments under those CBAs. Instead, Plaintiffs allege that even though their collective bargaining agents voluntarily negotiated for the HEP on behalf of all Union members, and membership ratified the agreement, their own participation is not voluntary under the ADA, which permits "voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees," 42 U.S.C. § 12112(d)(4)(B).

Plaintiffs' argument relies on the mistaken notion that collective bargaining agents cannot make voluntary choices collectively for union members. Negotiating employee benefits is a core

function of labor unions, and it falls apart if individual members can challenge particular terms that they dislike. In enacting the NLRA, Congress knew full well that collective bargaining represented a tradeoff: the unions could exercise the "collective strength and bargaining power" of their members as a whole, but individual members would cede power to the unions. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 270-71 (2009). "It was Congress' verdict that the benefits of organized labor outweigh the sacrifice of individual liberty that this system necessarily demands." *Id.* at 271. Unions necessarily "balance the economic interests of some employees against the needs of the larger work force as they negotiate." *Id.* at 270. Not every member likes every balance struck by a union, but union negotiating decisions bind union members. *Id.*; *see also Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953) ("The complete satisfaction of all who are represented is hardly to be expected."); *Lindsay v. Ass'n of Prof'l Flight Attendants*, 581 F.3d 47, 55 (2d Cir. 2009) ("[N]ational labor policy . . . extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees." (quoting *NRLB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 (1967))).

The power of unions to bind members extends to consent to searches. *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 826 (3d Cir. 1991) (*en banc*) (union may consent to drug testing on behalf of employees); *Barnard v. Lackawanna Cty.*, 696 F. App'x 59, 62 & n.3 (3d Cir. 2017) (citing *Bolden* as having "held that a union may expressly or implicitly waive an individual employee's constitutional rights in the context of the collective bargaining process" and then holding that a "requirement that a union attain the personal endorsement of members for the terms of a CBA [waiving federal claims] would be antithetical to the very essence of collective bargaining"); *Brown v. N.Y.C. Transit Auth.*, 112 F.3d 503 (2d Cir. 1996) (table) (citing *Bolden* with approval); *Spencer v. N.Y.C. Transit Auth.*, No. 95-CV-4779 (JG), 1999 WL 51814, at *10

(E.D.N.Y. Jan. 14, 1999). The ADA's concern with respect to employer medical "inquiries" and "examinations" is that they essentially function as searches, by revealing information about disabilities that could lead to discrimination "on the basis of disability." 42 U.S.C. § 12112(a), (d)(1); *see also Heston v. Underwriters Labs., Inc.*, 297 F. Supp. 2d 840, 845 (M.D.N.C. 2003) ("The obvious purpose of subsection (d) is to limit the gathering and use of medical information as one of the ways to reduce the possibility of discrimination."). Congress understood that such tests and inquiries could produce information about disability, and it prohibited employers from searching for such information involuntarily.

To be sure, unions cannot waive their members' rights to be free from discrimination. *See e.g.*, *Richards v. City of Topeka*, 173 F.3d 1247, 1251-52 (10th Cir. 1999) ("[A] collective bargaining agreement that would allow discrimination against people with disabilities in contravention of the ADA would be unenforceable."). But the Unions did not waive their members' rights to bring ADA claims. Instead, they gave the voluntary consent of their members to the Program. The ADA plainly allows voluntary medical examinations and inquiries in employee wellness programs; the CBAs here collectively manifested that voluntary participation.

The Unions here negotiated comprehensive benefits packages, including health insurance packages with no premiums and no deductibles. *See supra* Facts Section C.1. The Program was part of the package, intended to reduce health care costs by improving employee health. *Id.* (As noted above, *see supra* Facts Section C.2, the Program keeps all individually identifiable health information behind a HIPAA-compliant wall, unseen by anyone at Yale serving in an employment function.) The bargain the Unions achieved falls well within their powers. "[A] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents." *United Steelworkers of Am., AFL-CIO-CLC v. Rawson*, 495 U.S. 362, 374, (1990) (quotation marks omitted). Consequently, "[c]ourts generally may not interfere in [a]

21

bargained-for exchange," unless the union's actions were "arbitrary, discriminatory, or in bad faith." *Pyett*, 556 U.S. at 257, 271; *see Balestracci v. Gen. Dynamics Corp.*, 221 F. Supp. 2d 258, 266 (D. Conn. 2002) ("Union conduct is arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside the range of reasonableness as to be irrational.") (quotation marks omitted).

To be sure, the Unions could have bargained for a different agreement. They could have opted for their members to pay premiums or deductibles instead of agreeing to the Program. After all, employees nationwide, in all sorts of jobs, pay a portion of their health insurance premium costs, and pay deductibles. But the Unions chose to negotiate a plan that allowed their members to continue paying no health insurance premium and no deductibles. Three Plaintiffs now second-guess the Unions' choice. But that does not render a collectively *bargained* agreement involuntary.

The Unions made a choice, on behalf of their members, to agree voluntarily to the Program and its $25 weekly incentive. Plaintiffs do not contend that the choices voluntarily made by the Unions to achieve zero-premium zero-deductible health care for them were "arbitrary, discriminatory, or in bad faith." *Pyett*, 556 U.S. at 271. Those collectively bargained voluntary choices to participate in the Program satisfy the ADA. *See* 42 U.S.C. § 12112(d)(4)(B) (explicitly allowing "voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees"). The Court should thus grant summary judgment to Yale on the ADA claims.

### B.     The $25 Incentive Does Not Change a Voluntary Choice into an Involuntary Action.

The $25 weekly incentive that the Program provides to perform occasional recommended health actions does not render those actions involuntary. The ADA generally prohibits

22

discrimination "on the basis of disability in regard to . . . terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). That "prohibition against discrimination . . . include[s] medical examinations and inquiries." *Id.* at (d)(1). But Plaintiffs never claim that Yale uses medical exams or inquiries to discriminate. They do not allege discrimination of any sort.

Instead, they assert that the ADA's "prohibition against discrimination" is violated when a wellness program provides *any* financial incentives for recommended health actions. Those recommended health actions (the occasional physical, test or nurse coaching session) are not "voluntary," they say, because an employee who does not perform them pays a $25 weekly fee for opting out of Program guidelines. They view the health actions as involuntary because they believe that any financial incentive deprives an individual of free choice. Yet Plaintiffs acknowledge that they can choose whether to perform the recommended health actions, and that they themselves have made different choices: Turecek chose to perform the recommended health actions by participating in nurse-coaching sessions, while Schwartz chose not to perform the recommended health actions. First Am. Compl. ("FAC") ¶¶ 65, 73; Pls.' Ex. H ¶ 4; Pls.' Ex. I ¶ 4. In any commonsense understanding of the word, the recommended health actions are "voluntary," not required. This Court should apply the commonsense meaning, follow on-point authority and authority from other legal contexts construing "voluntary" in the context of individual choice, and interpret "voluntary" consistently with the broader statutory and regulatory context.

### 1.   The Plain Meaning of "Voluntary" Is "By Choice," Not "Severed from Financial Consideration."

To support their novel claims, Plaintiffs offer an extreme interpretation of voluntariness. Voluntariness, they say, means more than freedom from duress or coercion. "'[V]oluntary,'" they argue, "must mean a decision made without financial consideration." Pls.' Mem. 17. In

other words, "an act is only truly 'voluntary' when . . . divorced from financial considerations." *Id*. at 19. "[T]rue voluntary decision-making is . . . divorced from financial consideration, and characterized by true freedom of choice." Mem. 22 (advocating for what Plaintiffs believe to be "the proper definition of 'voluntary' as…divorced from financial consideration, and borne of genuinely free choice"). Decisions that are "influenced by financial consideration," they insist, are "not 'voluntary'." Mem. 23; *see also id.* at 24 ("a 'voluntary' activity is one severed from financial consideration"); *id.* at 26 (arguing for an "interpretation of 'voluntary' that guarantees a free choice, severed from financial considerations"). Plaintiffs offer only this interpretation of "voluntary," which they call the "plain meaning" of the word. *Id.* at 18.[8]

That is not the plain meaning of "voluntary." Few Americans have the luxury of leading lives "severed from financial considerations." We make choices about where to work, where to live, and what to buy—and nearly all of those choices are "influenced by financial considerations." That does not make our choices involuntary. It makes them practical and realistic. We seek work based partly on our interests, abilities and education, but also based on financial considerations: what we need to pay the rent or the mortgage, to meet our basic needs or our larger obligations. Decisions made in the light of such financial considerations are not involuntary. None of us live unconstrained by financial considerations. Our individual choices,

---

[8]    At times, Plaintiffs imply that voluntariness depends on employees' individual circumstances. *See id.* at 1, 7-8. But they understandably never argue for such a construction: If voluntariness turned on individual circumstances, employers could not construct employee wellness programs with any confidence in their lawfulness; courts would have to assess the wellness program lawfulness one employee at a time, potentially finding the same plan lawful for one employee and unlawful for another, maybe even lawful for the same employee one year but not the next. Moreover, any definition of voluntariness requiring investigation into the individual facts and circumstances of the three plaintiffs and the putative class members would destroy the commonality needed for a class action, making appropriate an order for Plaintiffs to show cause why class certification should not be denied. *See Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 97 (2d Cir. 2018). Maybe that explains why Plaintiffs take the position that voluntariness requires a *total* absence of financial consideration.

and the trade-offs we make between choices, are constrained by money.

Unlike Plaintiffs' homemade definition of "voluntary" ("a decision made without financial consideration"), the dictionaries they cite offer several well-established definitions that accord with the common-sense use of the term in our ordinary lives. Voluntariness means "done by design or intention," they acknowledge. Mem. 19 (citing both Black's Law Dictionary (1990) and Webster's Third New International Dictionary (1986) for definition). It means "acting of oneself"; "acting . . . of one's own free will without valuable consideration"; "acting . . . without any present legal obligation"; "unconstrained by interference"; "unimpelled by another's influence"; "produced . . . by an act of choice"; "without compulsion or solicitation"; "done by design or intention"; and "not accidental." *Id.* (citing Webster's and Black's).[9] These definitions represent the "ordinary, contemporary, common meaning" of voluntariness. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 n.5 (2002) (quotation marks omitted).

Schwartz acted by design or intention when he chose not to perform recommended health actions, and Turecek acted by design or intention when she chose to fulfill the Program requirements by participating in nurse-coaching sessions. *See* FAC ¶ 73; Pls.' Ex. H ¶ 4; Pls.' Ex. I ¶ 4. Their choices were "voluntary," not "mandatory."

### 2. Caselaw Supports the Plain Meaning of "Voluntary" as "By Choice," Not "Severed from Financial Consideration."

Plaintiffs cite no case anywhere holding that an employee wellness program with

---

[9]     *See also* Black's Law Dictionary (11th ed. 2019) (defining "voluntary" as "(1) Done by design or intention <voluntary act>"); Merriam-Webster's Dictionary and Thesaurus (2014 ed.) (defining "voluntary" as "(1) Done, made, or given freely and without compulsion… (2) Done on purpose: INTENTIONAL… (3) Of, relating to, or regulated by the will… (4) Having power of free choice…."); Concise Oxford English Dictionary (12th ed. 2011) (defining "voluntary" as "(1) Done, given, or acting of one's own free will – *Physiology* under the conscious control of the brain"); Merriam-Webster.com (updated Apr. 11, 2020) (defining "voluntary" as "(1) proceeding from the will or from one's own choice or consent // a *voluntary* action // *voluntary* cooperation").

financial incentives constitutes employment discrimination under the ADA in violation of 42

U.S.C. § 12112(d). Nor do we know of any. That is striking, as wellness programs nationwide—

set up by state governments, municipal governments, for-profit private employers, and non-profit

employers like Yale—provide financial incentives for periodic doctor visits and screening tests.

*See supra* Facts Sections A, B. Plaintiffs' interpretation runs counter to the only decisions

directly addressing the question, and conflicts more broadly with how the term "voluntary" has

long been understood in analogous contexts.

In *EEOC v. Orion Energy Systems, Inc.*, 208 F. Supp. 3d 989, 991 (E.D. Wis. 2016), the

EEOC brought an enforcement action, alleging Orion had violated the ADA "by requiring

employees who elect to enroll in Orion's self-insured health insurance plan to either complete a

health risk assessment (HRA) or pay 100 percent of their monthly premium amount"—then over

$400/month for single coverage. The court held that the "wellness program is voluntary under 42

U.S.C. § 12112(d)(4)(B)," the precise ADA provision at issue here. *Orion* held that a wellness

program "shifting *100 percent* of the premium cost to an employee who opted out of a program"

does not render the program involuntary: "even a strong incentive is still no more than an

incentive; it is not compulsion." *Id.* at 1001 (emphasis added).[10]

> Orion's wellness initiative is voluntary in the sense that it is optional. An employee is not
> required to participate in the program and is instead given a choice: either elect to
> complete the HRA as part of the health program or pay the full amount of the health
> benefit premium. A corporation is not required to fully pay for an employee's health
> insurance—indeed, it is not required to provide health insurance at all—and it is not
> unlawful to give an employee a choice regarding her health benefits provided the choices
> are among lawful alternatives. There may be strong reasons to comply with an employer's
> wellness initiative, and the employee must balance the considerations in deciding whether
> to participate or not.

---

[10]   The court recognized that the EEOC's 2016 Rules had established that a wellness "program remains
voluntary if the employer provides a financial incentive at or below thirty percent of the total cost for self-
only coverage," but did not apply those rules because the challenged conduct predated the rules and the
EEOC didn't argue they applied retroactively. *Id.* at 1000.

*Id. Orion* recognized that a "hard choice is not the same as no choice." *Id.* (quoting *U.S. v. Martinez-Salazar*, 528 U.S. 304, 315(2000)). The Orion employee who chose to opt out of the wellness program "made a choice about what was truly important to her. She chose to forego the medical examination and pay the full amount of her health benefit premium. This choice may have been difficult, but is a choice nonetheless." *Id.*; *see also Provance v. Gallatin Cty.*, No. CV-13-S1-BU-SEH, 2015 WL 1810307, at *2, *6 (D. Mont. Apr. 17, 2015) (holding, before the 2016 Rules, that wellness program with $50 monthly incentive was voluntary). Some choices are harder than others: the incentive in *Orion* was more than four times higher than the $25 weekly incentive in the Program. But even hard choices are still real choices.

Understanding voluntariness in its ordinary meaning (intentional), rather than the utopian meaning Plaintiffs proffer ("severed from financial consequences"), is consistent with the word's use in much of American law. Our law has long addressed voluntariness in the context of contracts. *See, e.g.*, *Nation-Bailey v. Bailey*, 316 Conn. 182, 200 (2015) ("Although parties might prefer to have the court decide the plain effect of their contract contrary to the agreement . . . contracts voluntarily and fairly made should be held valid and enforced in the courts."). The voluntary agreement that a contract represents cannot be voided because one party later claims that they were "influenced by financial considerations." Financial influences do not destroy the voluntariness of an agreement. Those influences are the common cause of contracts: a widget maker wants profits and a widget buyer wants the widgets at a good price. Contracts are voidable as involuntary if a party was subject to duress, which means something much more than financial influence. *Weisman v. Kaspar*, 233 Conn. 531, 549 n.15 (1995) (requiring a showing of "a wrongful act or threat" that "left the victim no reasonable alternative" and resulted in a "transaction [that] was unfair to the victim" (citing Restatement (Second) of Contracts § 175)); *see also, e.g.*, *Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 142 (2d Cir.

2011) (noting that "to void a contract on the ground of economic duress" under New York law, a plaintiff must prove that an agreement "was procured by means of (1) a wrongful threat that (2) precluded the exercise of its free will."); *DiMartino v. City of Hartford*, 636 F. Supp. 1241, 1251 (D. Conn. 1986) ("economic pressure" not duress unless "a reasonable person would be put in fear of the consequences to the extent that his will would be overcome," and thus plaintiff was not under duress in signing agreement with employer merely because employer threatened to cancel his pension if he did not agree).[11]

A similar understanding of voluntariness undergirds the law of permissible consent searches. As noted *infra* Section I.B.3, the ADA prohibits employers from using medical tests or inquiries as searches for disability information that could lead to discrimination. *Cf. Schmerber v. California*, 384 U.S. 757, 767 (1966) (holding that an involuntary blood "testing procedures plainly constitute searches of 'persons'" under the Fourth Amendment). Voluntariness in the context of searches is well-defined—and was well-defined when Congress enacted the ADA. Police can search people who give valid consent—without needing a warrant or probable cause or even reasonable suspicion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). And consent is defined through voluntariness: it must be "freely and *voluntarily* given." *Florida v. Royer*, 460 U.S. 491, 497 (1983) (emphasis added). Consent is "freely and voluntarily given," *id.*, when "a reasonable person would understand that he or she is free to refuse," *U.S. v. Drayton*, 536 U.S. 194, 197 (2002) (where three police officers boarded a bus, with one stationed at the front, one stationed at the back, and a third approaching passengers one-by-one and asking for consent to search their bags and persons, finding that passengers would understand that their "consent to the

---

[11] Plaintiffs' interpretation, taken to its natural extreme, would turn most employment into "involuntary" servitude. *See* 18 U.S.C. § 1584. After all, most of us work at least partly for financial reasons.

search was voluntary"). Consent is *in*voluntary only when it is "the product of duress or coercion." *Schneckloth*, 412 U.S. at 227.

Our law nearly always understands voluntariness in this fundamental sense of choice, even when choices are not easy. Criminal defendants—including the wrongly accused—face harder choices than whether to pay $25 a week to avoid occasional medically recommended health actions, but that does not make their choices involuntary. "'Voluntary' for purposes of entering a lawful plea to a criminal charge has never meant the absence of benefits influencing the defendant to plead." *U.S. v. Doe*, 537 F.3d 204, 211 (2d Cir. 2008). Likewise, confessions are "constitutionally involuntary" only where there is "coercive police activity." *U.S. v. Haak*, 884 F.3d 400, 409 (2d Cir. 2018); *see also Schneckloth*, 412 U.S. at 227 (consent to warrantless search is voluntary unless "the product of duress or coercion"). Civil law views voluntariness similarly. *See, e.g.*, *McIntosh v. Walgreens Boots All., Inc.*, 135 N.E.3d 73, 80 (Ill. 2019) (holding, under the common law voluntary payment doctrine, payments are "not voluntary" only if "there was some necessity that amounted to compulsion"); *Disciplinary Counsel v. Hickey*, No. FSTCV084014896S, 2016 WL 4543178, at *20 (Conn. Super. Ct. Aug. 5, 2016), *aff'd*, 328 Conn. 688 (2018) (in the context of an attorney's "knowing and voluntary" waiver of right to reapply for bar admission, "the need to make a difficult choice does not convert that decision-making process into an involuntary action"); *Mericle v. Jackson Nat'l Life Ins. Co.*, 193 F. Supp. 3d 435, 453 (M.D. Pa. 2016) (to show duress rendering payment "involuntary," must show a "degree of restraint or danger . . . which is sufficient in severity or apprehension to overcome the mind of a person of ordinary firmness"); *Weisman*, 233 Conn. at 549 n.15 (payment to release mortgage was not "involuntary" unless made under duress—that is, caused by an "unlawful act or threat"). Many of the choices posed in these contexts carry stark consequences—the loss of liberty, a profession, a home—but despite those pressures, the choices are legally voluntary.

29

Because no court has endorsed their view that wellness programs cannot include any financial incentive, Plaintiffs ask this Court to follow definitions of voluntariness used in the False Claims Act and Fair Labor Standards Act. Pls.' Mem. 21-22, 24-26. Both address "voluntariness" in the fundamentally different context of determining what is work and what is a "voluntary" non-work activity. Neither helps them.

"By allowing *qui tam* relators to share in any recovery, the FCA encourages those with knowledge of fraud against the government to bring that information to the fore." *U.S. ex rel. Doe v. John Doe Corp.*, 960 F.2d 318, 321 (2d Cir. 1992). The purpose of that incentive "is lost" if the relator is a federal employee already "charged with investigating fraud," *U.S. ex rel. Paranich v. Sorgnard*, 396 F.3d 326, 340-41 (3d Cir. 2005), or is "provid[ing] information in response to a governmental inquiry," *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 917 (7th Cir. 2009). Thus, the FCA's requirement of "voluntary" disclosures "reward[s] those relators who, without any requirement to do so, took the risk to come forward as whistleblowers," while not "reward[ing] individuals for simply doing their job, which they are already paid to do." *U.S. ex rel. Griffith v. Conn*, No. CIV. 11-157-ART, 2015 WL 779047, at *1, *4 (E.D. Ky. Feb. 24, 2015) (examining the FCA's purposes to "determine which of the many definitions of voluntary best fits the FCA"); *cf. Doe*, 960 F.2d at 321 (FCA designed to "strike a balance between encouraging private citizens to expose fraud and avoiding parasitic actions by opportunists"). That context-specific FCA distinction does not support Plaintiffs' argument that a financial incentive turns a voluntary choice into an involuntary action.

Nor does the FLSA. The FLSA regulations to which Plaintiffs refer ensure that employers pay hourly employees for all "working time," but does not require them to pay more for time spent on work-adjacent activities, such as seminars, as long as attendance is "voluntary." *See Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 721 (2d Cir. 2001) (citing

29 C.F.R. § 785.27). If a worker suffers a job-related consequence for not doing something, then the activity is not voluntary in the sense of the FLSA: it is part of the job, and an hourly worker should be paid for the time. *See id.* at 721-22. But again, that distinction does not help Plaintiffs show how a financial incentive could automatically transform a voluntary choice into an involuntary action.

The FCA and FLSA case law is inapposite. The more pertinent authority comes from the decisions discussed above addressing voluntariness in the ADA wellness program context, as well as the broader body of law addressing the effect of incentives on voluntary choice, including the foundational notions of contractual agreement and voluntary consent to searches. The $25 weekly incentive at issue here falls in the heartland of voluntary choices under that body of law.

### 3.   *The Statutory and Regulatory Context Shows That Incentives Don't Make Voluntary Choices into Involuntary Actions.*

Like the plain text and the caselaw, the broader statutory and regulatory context confirms that employee wellness programs can provide financial incentives. Financial incentives are consistent with the ADA's antidiscrimination goals. Moreover, both the ACA and HIPAA permit financial incentives for participation in wellness programs, and it would make no sense to read the ADA's allowance of "voluntary" wellness programs to prohibit the very incentives permitted by the ACA and HIPAA. *See supra* Facts Section B.

#### a.   *Financial incentives do not undermine ADA antidiscrimination goals.*

Plaintiffs wrongly argue that the ADA's antidiscrimination goals compel their extreme definition of "voluntary." Pls.' Mem. 26-29. True, the ADA aims to prevent disability discrimination, and it prohibits involuntary medical tests or inquiries that could serve as involuntary searches for disability-related information. But it also recognizes the benefits of employee wellness programs, which used financial incentives long before the ADA. *Supra* Facts

Sections A, B. It is not necessary to distort the meaning of "voluntary" and sweep aside countless employee wellness programs nationwide in order to achieve the ADA's antidiscrimination goals: ADA regulations already address antidiscrimination goals in the wellness program context by requiring that employee wellness programs be "reasonably designed to promote health or prevent disease," and that they not be "a subterfuge for violating the ADA or other laws prohibiting employment discrimination" or otherwise "highly suspect in the method chosen to promote health or prevent disease." 29 C.F.R. § 1630.14(d)(1); *see also* 81 Fed. Reg. at 31,140 ("It is not sufficient for a covered entity merely to claim that its collection of medical information is part of a wellness program; the program . . . must be reasonably designed to promote health or prevent disease.").[12] This Court need not interpret "voluntary" to mean "divorced from financial considerations" for the ADA to prevent discrimination. When wellness programs are properly designed and administered—as the law requires—financial incentives are perfectly compatible with antidiscrimination law.

Plaintiffs do not claim that the Program violates these regulations governing proper construction of a wellness program. They do not claim that the Program is a "subterfuge for discrimination" or "highly suspect" in its design. Nor could they. Under the Program:

- All private health information is kept beyond a HIPAA "wall," meaning that no one at Yale involved in employment decisions can access it. Penney Decl. ¶¶ 31, 41.

- HealthMine, which administers the Program from behind the HIPAA wall, merely tells Yale's payroll processing system each quarter which employees will have the $25 weekly deduction—revealing no private health information. Penney Decl. ¶ 40.

- To avoid the $25 payment, employees complete only a small number of recommended preventive health actions (and only as appropriate to their age and sex), designed reasonably "to promote health or prevent disease." Penney Decl. ¶ 16.

---

[12]   These portions of the regulations remain extant. Plaintiffs ignore these portions.

- Any information employees choose to disclose to a health coach is protected by the HIPAA wall. Penney Decl. ¶ 44.
- Employees can apply for an exemption to a health action or pursue health coaching as an alternative. Penney Decl. ¶¶ 13, 19.

And these privacy-protecting Program provisions form part of a generous health care plan:

- Union members pay *no* premium, *no* deductible, and almost no copayments for the Yale Health Plan. Freiman Decl., Ex. N at YU-00000113 (setting employee premium contributions at $0 for Yale Health); *id.* at YU-00000115 (setting no deductible, no coinsurance, and copays only for prescriptions and emergency room visits).
- For most Union members, the $25 weekly Program incentive represents the *only* cost they pay for health coverage (and only if they choose not to undertake the occasional doctor visit, test, or nurse coaching). Penney Decl. ¶¶ 7, 30.
- That $25 weekly incentive cost represented, in 2018, less than 14% of the cost for individual health coverage in the Yale Health Plan (the least expensive plan), less than 5% of the cost for family coverage in the Yale Health Plan, less than 12% of the cost for individual coverage in the Aetna plan, and less than 4% of the cost for family coverage in the Aetna plan. The incentive cost represented even smaller percentages in later years, when premiums rose. *See* Penney Decl. ¶ 15; ECF No. 45 (stipulation).
- By comparison, under the average group health plan in Connecticut in 2018, an employee paid out of pocket a $1,672 premium (23% of the total cost) for self-only coverage, had a $2,322 self-only deductible and $7,816 in other potential out-of-pocket costs such as co-pays—often *without* the choice to lower those costs by participating in a wellness program. *See* Freiman Decl., Ex. O.
- In other words, a Union member who chooses not to participate in the Program and pays the $25 incentive cost every week still *pays far less for health care* than the average Connecticut resident.
- Union members can also choose not to enroll in Yale-sponsored health insurance, and thus not be subject to the Program at all. Penney Decl. ¶¶ 11-12.
- Union members can seek exemptions based on religious or other grounds. *Id.* ¶ 13.

33

On these undisputed facts, the Program is not a "subterfuge for discrimination" or "highly suspect" in design. The modest financial incentives in the Program do not make it a Trojan Horse for disability discrimination, and they do not make Union members' decisions whether to perform recommended health actions "involuntary."

### b.   42 U.S.C. § 12112(d) should not be read to conflict with the ACA or HIPAA.

The ADA provision allowing voluntary medical examinations and inquiries as part of employee wellness programs forms a part of a larger web of statutory and regulatory provisions governing financial incentives in wellness programs.[13] The ADA does not prohibit financial incentives, and it would make no sense to infer from silence that it bans incentives that the ACA statutory text and HIPAA regulations expressly allow.

The ACA explicitly authorizes wellness programs to include significant financial incentives: no limit on size for purely participatory programs, and a limit of 30% of plan cost for programs contingent on meeting health outcomes. *See* 42 U.S.C. § 300gg-4(j). By arguing that the ADA bars all financial incentives, Plaintiffs necessarily contend that Congress designed and calibrated a system of wellness program incentives in the ACA that it knew employers could never actually use—because they violated the ADA. Congress should not be presumed to have created an elaborate nullity. *See U.S. v. Harris*, 838 F.3d 98, 106 (2d Cir. 2016).

Plaintiffs' theory of voluntariness likewise conflicts with the larger pre-ACA history of wellness program incentives. Congress knew about wellness program incentives when it enacted the ADA with a savings clause specifically aimed at preserving wellness programs. *Supra* Facts Section B. A few years later, Congress enacted HIPAA with a similar carve-out for wellness

---

[13]   AARP previously acknowledged that federal law permits wellness program incentives. Pl.'s Reply in Support of Prelim. Inj., ECF No. 17, *AARP v. EEOC*, No. 16-cv-2113 (D.D.C. Nov. 22, 2016), at 17-18 ("AARP does not contend that *any* penalties/incentives are coercive . . . ." (emphasis in original)).

programs, which the Departments of Treasury, Labor, and HHS have all interpreted to permit financial incentives. *See id.*; 71 Fed. Reg. at 75,035, 75,043, 75,052 (Dec. 13, 2006).

In support of their erroneous interpretation of the ADA, Plaintiffs cite a single sentence in a 2000 non-binding EEOC guidance document stating that voluntary programs must not "penalize[] employees who do not participate." *Enforcement Guidance: Disability-Related Inquiries & Medical Examinations of Employees Under the [ADA]*, EEOC (July 27, 2000), 2000 WL 33407181, at \*16. That document represents only informal guidance lacking *Chevron* deference, and it does not overrule formal regulations, much less Congressional intent. *Mount Royal Joint Venture v. Kempthorne*, 477 F.3d 745, 754 (D.C. Cir. 2007) ("[I]f the agency enunciates its interpretation through informal action that lacks the force of law, we accept the agency's interpretation only if it is persuasive."). That single sentence from 2000 lacks persuasive power: it offers no reasoning and does not explain what it means by "penalize," a word absent from the ADA text.[14] The EEOC has not understood the 2000 guidance to bar all financial incentives: a 2009 "discussion letter" from its Office of Legal Counsel interpreted the ADA as consistent with HIPAA in permitting incentives up to 20% of a plan's cost. Freiman Decl., Ex. L (*ADA: Disability-Related Inquiries and Med. Exams.; Health Risk Assessment*, EEOC (Mar. 6, 2009)). When it later withdrew that discussion letter, EEOC merely observed that it had not yet taken a final position on wellness program incentives, *id.*—underscoring that the

---

[14]   The word "penalize" provides no meaningful "guidance." *See* 80 Fed. Reg. 21,659, at 21,660-62 (Apr. 20, 2015 discussion of proposed ADA rules) (noting that despite the 2000 guidance, EEOC had not "addressed the extent to which incentives might affect the voluntary nature of a wellness program," that "[i]ncentives can be framed as rewards or penalties," and that even a strict reading of "voluntary" would permit de minimis incentives); Freiman Decl., Ex. K (*Wellness Programs Under Fed. Equal Employment Opportunity Laws*, Transcript of Open Session, EEOC (May 8, 2013) (regarding the 2000 guidance that employees must not be "penalize[d]" for nonparticipation, an EEOC commissioner observed that "for employers who are trying to figure out what in fact they can and cannot do, that's not a particularly helpful sentence," and that everyone in the room would agree that a "\$10 gift card to Starbucks" was a permissible incentive for a "voluntary" screening test).

2000 guidance receives no deference. EEOC confirmed during 2013 hearings that it had not

taken a position on wellness program incentives, that it recognized the 2000 guidance did not

articulate a meaningful position, and that consistency with the ACA and HIPAA was a chief

concern. *See id.*, Ex. K.[15]

The EEOC addressed that concern in the 2016 Rules, ending the years of agency

unclarity. Those rules are now withdrawn, and while the EEOC has announced its intention to

replace them imminently, it has not yet done so. The new suit brought by AARP on behalf of

Plaintiffs seeks to take tactical advantage of that regulatory interregnum in order to establish a

precedent that could invalidate employee wellness programs nationwide—including, in this

District, union-negotiated programs run by the State of Connecticut, the City of New Haven, and

others. But the regulatory gap does not alter the statute. It leaves the ADA coexisting with the

ACA—which explicitly permits employee wellness program financial incentives—and with the

HIPAA regulations promulgated by the Departments of Treasury, Labor, and HHS, all of which

explicitly permit employee wellness program financial incentives. The word "voluntary" should

not be read to prohibit what these other federal statutes and regulations clearly allow.

The incentives provided in the Program fall well within the range permitted by the ACA

and by HIPAA regulations promulgated by Treasury, Labor, and HHS. Plaintiffs have stipulated

---

[15]   Unlike the 2000 informal guidance that Plaintiffs repeatedly ask this Court to follow, *see* Mem. 10, 13, 14, 15, the 2016 Rules were promulgated after notice and comment, with extensive explanation of each provision. Plaintiffs make much of EEOC's December 2018 withdrawal of the 2016 Rules after they were found to have been promulgated with procedural flaws. *Id.* at 3, 12, 29-30. But while the 2016 Rules are no longer entitled to *Chevron* deference, this Court does not have to ignore the rationales that the EEOC gave when adopting them. The EEOC offered much more explanation—and process—in the 2016 Rules than in the unreasoned, single-sentence 2000 informal guidance Plaintiffs rely on. *See Orton Motor, Inc. v. U.S. Dep't of Health & Human Servs.*, 884 F.3d 1205, 1211 (D.C. Cir. 2018) (weight of informal agency statements depends on thoroughness and validity of explanation). Ironically, it was Plaintiffs' counsel (AARP) that argued that the 2016 Rules were invalid on procedural grounds, but that now asks for deference to an agency statement based on far less.

to that. *See* ECF No. 45 (incentive fee represents less than 14% of individual-only health plan

cost at 2018 rates—even if incurred every week of the year). This Court should interpret

voluntariness in 42 U.S.C. § 12112(d)(4)(B) to accord with the broader statutory context. After

all, "the meaning of one statute may be affected by other Acts, particularly where Congress has

spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson*

*Tobacco Co.*, 529 U.S. 120, 133 (2000) (quotation marks and citation omitted). The Court should

enter summary judgment for Yale on the ADA counts on this additional ground. *See Haak*, 884

F.3d at 408-09 (court can determine voluntariness as a matter of law on the basis of undisputed

facts).

> **C.      The Program Is Voluntary Under the 2016 Rules, Which Govern the 2017
>           and 2018 Plan Years.**

EEOC's 2016 Rules regarding wellness programs under the ADA expressly allow

incentives of up to 30% of plan cost. Those Rules govern at least the 2017 and 2018 plan years

for the Program. Because Plaintiffs concede that the financial incentives in the Program fall well

below 30% of the plan cost, *see* ECF No. 45, the 2016 Rules provide an additional basis for

summary judgment for the 2017 and 2018 plan years.

EEOC promulgated the 2016 Rules with an effective date of January 1, 2017, 81 Fed.

Reg. at 31,129 (May 17, 2016), and it withdrew them with an effective date of January 1, 2019,

83 Fed. Reg. 65,296 (Dec. 20, 2018). The 2016 Rules were thus in effect for 2017 and 2018. An

agency's withdrawal of a rule generally has no retroactive effect. *Arkema Inc. v. EPA*, 618 F.3d

1, 7-10 (D.C. Cir. 2010). The district court in *AARP v. EEOC* did not find that the substance of

EEOC's rules necessarily conflicted with the statute, and its order, stayed until January 1, 2019,

became moot when EEOC withdrew the rule before then.[16]

Even if the *AARP* court's order had gone into effect, it was clearly intended not to be retroactive. Indeed, the court suspended even prospective effect, finding that immediate vacatur of the 2016 Rules would cause "nationwide disruption" because "employers need to know the regulatory incentive structure for the following year . . . in order to have enough time to design their wellness plans," and it was unlikely that "employees w[ould] be able to cope with a shift in their healthcare plans on such short notice." 292 F. Supp. 3d at 243. "The egg ha[d] been scrambled" for the 2018 benefit plants that were about to take effect. *Id.* (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002)).

Finding regulations invalid is not the same as, and does not automatically trigger, vacatur of the regulations *ab initio*. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) ("[Appellant] insists the court must have vacated the rule because it declared the rule 'invalid,' but the terms 'invalid' and 'vacated' are not synonyms. . . . [W]e may label an agency's action 'invalid' even when we have remanded it for further proceedings without having vacated it."). Courts may choose not to vacate a rule where it is flawed procedurally but might ultimately be substantively reasonable. *NRDC v. EPA*, 808 F.3d 556, 584 (2d Cir. 2015).[17] They can choose not to vacate an invalid rule where actions taken in reliance on the rule would be disruptive to unwind or unfair to penalize. *Sugar Cane Growers*, 289 F.3d at 97-98; *Allied-*

---

[16]   That court expressed skepticism about the rules' substance but invalidated them because of EEOC's insufficient explanation for the rules. 267 F. Supp. 3d at 37 ("EEOC has failed to adequately explain its decision to construe the term 'voluntary' in the ADA and GINA to permit the 30% incentive level adopted in both the ADA rule and the GINA rule. . . . To be clear, this would likely be a different case if the administrative record had contained support for and an explanation of the agency's decision, given the deference courts must give in this context."). A district court's skepticism doesn't bind this Court.

[17]   *See also Susquehanna Int'l Grp., LLP v. SEC*, 866 F.3d 442, 451 (D.C. Cir. 2017); *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993); *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1312 (D.C. Cir. 1991).

*Signal*, 988 F.2d at 151; *see also Wisc. Res. Prot. Council v. Flambeau Min. Co.*, 727 F.3d 700, 709 (7th Cir. 2013) (parties rely on presumptively valid regulations).[18] Or they may vacate a rule only prospectively, or after a stay period, to address the same concerns that justify not vacating a rule at all. *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995).[19] Here, both rationales applied: the *AARP* court found the rule procedurally flawed but not irredeemable and it found that vacatur would cause undue disruption.

For those reasons, the court entered a non-retroactive order that it also stayed through the end of 2018. Because Plaintiffs concede that the Program complied with the 2016 Rule's 30% cap, and the 2016 Rules govern the 2017 and 2018 plan years, the Court should grant summary judgment for Yale for all claims involving those plan years.

## II. Yale Is Entitled to Dismissal or Summary Judgment on the GINA Claims (Counts III and IV).

Plaintiffs' attacks on the Health Expectations Program have nothing to do with genetics or discrimination. Their GINA claims thus lack the most rudimentary foundation.

GINA prohibits employers from discriminating against employees on the basis of their "genetic information." 42 U.S.C. § 2000ff-1(a). It limits an employer's ability to "request, require, or purchase genetic information" of its employees, *id.* § 2000ff-1(b), because Congress aimed to prevent "fear of misuse of genetic information" from "deter[ring] individuals from being tested for genetic disorders, seeking genetic services, or participating in important genetic research." H.R. Rep. 110-28(I), House Comm. on Educ. & Labor (Mar. 5, 2007), at 36; *see also*

---

[18]   This principle has repeatedly been applied to remand, rather than vacate, implemented regulations in similar contexts, where vacatur of an invalid regulation could cause significant disruption. *See e.g.*, *Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1, 14 (D.D.C. 2019).

[19]   *See also, e.g.*, *St. Lawrence Seaway Pilots Ass'n v. U.S. Coast Guard*, 357 F. Supp. 3d 30, 38 (D.D.C. 2019).

S. Rep. 110-48, Sen. Comm. on Health, Educ., Labor, and Pensions (Apr. 10, 2007), at 28-29.

Plaintiffs do not claim that Yale has discriminated on the basis of genetic information.[20] It is

undisputed that the HEP doesn't include any genetic testing.

Unable to claim genetic discrimination under GINA, Plaintiffs try to create new kinds of

GINA claims. They assert that the Program violates GINA because, if their spouses participate in

the health plan, their spouses' medical information can be seen when HealthMine monitors

YGHP claims data as part of the Program, and because their spouses might discuss their medical

histories during health coaching sessions. Pls.' Mem. 15-16; FAC ¶¶ 117-18.[21] But Plaintiffs lack

standing to bring their novel claims, and even if they had standing, neither HealthMine's

monitoring of spouses' claims data nor spouses' participation in health coaching would give rise

to a GINA action, for several independent reasons set out below. Finally, GINA does not provide

a private right of action for damages for the type of claims Plaintiffs assert.

**A.     Plaintiffs Lack Standing to Bring the GINA Claims.**

The Court should dismiss the GINA claims for lack of standing because no Plaintiff has

pleaded an injury-in-fact under GINA. Plaintiffs bear the burden of establishing standing. *Lujan*

*v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Article III standing exists only when a

harm is alleged that "affect[s] the plaintiff in a personal and individual way." *Spokeo, Inc. v.*

*Robins*, 136 S. Ct. 1540, 1548 (2016). That alleged harm must be "real" and "actual or

imminent," not "abstract," "conjectural or hypothetical." *Id.* Here it's conjectural at most.

---

[20]    Except as to genetic test results, GINA doesn't prohibit discrimination on the basis of an employee's own medical history (though other laws do). But because a *relative's* medical history could predict an employee's genetics, medical history of an employee's "family members" *is* considered the employee's "genetic information" under GINA. *See* 42 U.S.C. § 2000ff(4), (7); H.R. Rep. 110-28(I), House Comm. on Educ. & Labor (Mar. 5, 2007), at 36.

[21]    Spousal medical history does not reveal the genetic information of an employee, but GINA defines it as "genetic information" for statutory purposes. That is because spouses, who are not genetically related to employees, are defined as "family members" under GINA. *See* 42 U.S.C. § 2000ff(3).

Plaintiffs' novel GINA claims rely entirely on the allegedly involuntary sharing of the medical histories of their spouses. They allege that if their spouse chooses to enroll in a Yale-sponsored health plan, then information about their spouse's medical history could be discussed during health coaching sessions and could be accessible to HealthMine as it administers the Program for YGHP. *Id.* at 15-16; FAC ¶¶ 117-18.

Plaintiffs identify no tangible harm that they suffer from those alleged actions. None of the three Plaintiffs claims that the allegedly involuntary sharing of a spouse's medical history caused them to opt out of the Program and pay the $25 weekly fees. One, Christine Turecek, is unmarried and makes no GINA claim. *See* FAC ¶ 73. The other two, Lisa Kwesell and Jason Schwartz, are married and bring the GINA claims. Kwesell alleges that she and her husband participated in the Program until January 2020, when she sought exemption from colorectal screening. FAC ¶ 11; Pls.' Ex. G. She does not allege that she stopped participating in the Program to avoid her husband sharing his medical history. Schwartz alleges that he opted out due to "privacy concerns," but he admits that his wife—unlike him—complies with the Program, FAC ¶¶ 13, 65; Pls.' Ex. I, even though there would be no additional opt-out fee imposed if both were non-participating. Because neither Kwesell nor Schwartz alleges that the treatment of spousal medical history caused them to leave the Program and pay the fees, neither claims an injury-in-fact from the putative violations of GINA.

Simply put, Kwesell and Schwartz—the Plaintiffs bringing GINA claims—do not allege that they were *themselves* harmed by the alleged review of their *spouses'* medical history. Congress did not define "genetic information" under GINA to include spouses' medical histories because a spouse's medical history reveals genetic information about the employee: it obviously does not. Congress defined GINA to include spousal medical history in the definition of "genetic information" to prevent employers from discriminating against employees on the basis of their

spouses' medical histories. *See* H.R. Rep. 110-28(I), House Comm. on Educ. & Labor (Mar. 5, 2007), at 36. For example, an employer might fire an employee to avoid the cost of providing medical care for a high-cost spouse. But Plaintiffs do not allege that their spouses' medical histories have been used to discriminate against them or otherwise harm them.

Perhaps Plaintiffs worry abstractly that spousal medical history reported in the Program could be used to discriminate against them. They would be wrong to worry, since the Program operates behind a HIPAA wall that prohibits health information from being seen by anyone involved in Yale's functions as an employer. *See infra* Section II.B.2. But even if they had such a worry, it would not constitute an "injury-in-fact": it would be, at most, a hypothetical or conjectural injury. *See Spokeo*, 136 S. Ct. at 1548; *see also Katz v. Donna Karan Co., LLC*, 872 F.3d 114, 120 (2d Cir. 2017) (plaintiff failed to establish a non-speculative risk of harm resulting from defendants' disclosure of personal credit card information in violation of statute).

Because Plaintiffs have failed to meet their burden of pleading an injury-in-fact from the alleged GINA violations, the GINA claims should be dismissed.

### B.      The GINA Claims Fail as a Matter of Law.

In addition to Plaintiffs' lack of standing, Plaintiffs' GINA claims also fail as a matter of law for several independent reasons. First, neither Kwesell nor Schwartz were required to enroll their spouses in Yale-sponsored insurance plans; they voluntarily chose to enroll their spouses. Moreover, Kwesell and Schwartz agreed to the Program as part of their participation in collective bargaining through their representatives in the Unions. Second, HealthMine's monitoring of claims data represents an internal function of ERISA plan management, authorized by HIPAA, segregated from any employment function at Yale, and thus explicitly permitted by GINA. Third, Plaintiffs do not even allege that their spouses participated in health coaching sessions, let alone that they were required to disclose spousal medical history during such

sessions—and even if they did, the $25 weekly cost for nonparticipation wouldn't make participation "involuntary." Finally, even if the Program violated GINA, the statute does not provide a private damages action for claims, like those here, that do not involve discrimination.

1. **Plaintiffs and Their Unions Voluntarily Agreed to Both Health Coaching and Claims Data Monitoring.**

GINA does not bar a union from collectively negotiating a health care package for its members that includes *zero-premium* health insurance coupled with a reasonable financial incentive to participate in a wellness program. It would defy common sense and long-established principles of labor law to deem such a program "involuntary." *See supra* Section I.A. For that reason alone, the Court should grant summary judgment. If anything, that reason has even more force in the GINA context, where Plaintiffs base their claims *solely* on the use of medical histories of spouses *whom the employees voluntarily enrolled* in Yale-sponsored insurance plans. *See* 42 U.S.C. § 2000ff-1(b)(2) (permitting "voluntary" collection of genetic information in connection with a wellness program); Penney Decl. ¶¶ 11-12 (employees choose whether to enroll spouses in Yale-sponsored insurance plans and face no adverse consequences if they choose not to enroll them).

2. **HealthMine's Monitoring of Claims Data Complies with HIPAA and Doesn't Violate GINA.**

Plaintiffs erroneously contend that Yale violates GINA merely by transferring insurance claim data to HealthMine without Plaintiffs' consent. *See* Pls.' Mem. 30-31. Their argument fundamentally misunderstands the relationship among ERISA, HIPAA, and GINA. HealthMine reviews and utilizes data behind a HIPAA wall as part of the administration of an ERISA group health plan. GINA does not prohibit uses and disclosures permitted by HIPAA. *See* 42 U.S.C. § 2000ff-5(c) (GINA "does not prohibit a covered entity under such [HIPAA] regulations from any use or disclosure of health information that is authorized for the covered entity under such

[HIPAA] regulations."); 29 C.F.R. § 1635.11(d) (same). Indeed, the U.S. Department of Health and Human Services Office for Civil Rights has specifically found HealthMine's monitoring of YGHP data to be lawful. *See* Ex. Q.

Under ERISA, employers can "sponsor" employee health plans that they also "administer," 29 U.S.C. § 1002(16); 29 C.F.R. § 2510.3-16, as Yale does with the YGHP. HIPAA requires separation between the sponsor and administrator functions. Employers achieve that "adequate separation between the group health plan and the plan sponsor" by ensuring that "employees . . . given access to the protected health information" (PHI) are walled off from the rest of the employer. 45 C.F.R. § 164.504(f). The walled-off employees who have access to PHI in their work administering the group health plan may "[n]ot disclose protected health information . . . for the purpose of employment-related actions or decisions." *Id.* Employers administering a group health plan may also delegate plan administration functions to outside contractors if the contractors sign written "business associate agreements" (BAAs) binding them to HIPAA's privacy rules. *See* 45 C.F.R. §§ 164.502(e), 164.504(e); *see generally* Ex. T (*Bus. Assocs.*, U.S. Dep't of Health & Human Servs. (updated May 24, 2019).

Walled-off health plan administrators, whether in-house or outside contractors, pay claims and thus necessarily have access to claim data. HIPAA allows health plan administrators to use plan data not just for paying claims but also to perform a variety of internal "health care operations," including data analyses and cost-lowering programs. 45 C.F.R. § 164.506(c) (authorizing plans to "use or disclose protected health information for its own . . . health care operations"); *id.* § 164.501 (defining "health care operations" to include "population-based activities relating to improving health or reducing health care costs . . . and related functions,"

"care coordination," and "conducting cost-management and planning-related analyses").[22]

HIPAA authorizes plan administrators to give the employer/sponsor "data analyses" of claims, so long as it does not give the employer individually identifiable PHI. 45 C.F.R. § 164.501. HIPAA also lets plan administrators provide the employer with "information on whether [an] individual is participating in the group health plan." *Id.* § 504(f)(1)(iii).

When an employer or health plan uses or discloses data in a manner permitted by HIPAA, GINA expressly provides that there shall be no liability. Title II of GINA, which governs employment provisions, is the portion on which Plaintiffs rely, and it makes plain that compliance with HIPAA's rules for the use of PHI means compliance with GINA: "[GINA] does not prohibit a covered entity under [HIPAA] from any use or disclosure of health information that is authorized for the covered entity under [HIPAA]." 42 U.S.C. § 2000ff-5(c); *see also* 29 C.F.R. § 1635.11(d) ("This part [addressing GINA] does not apply to genetic information that is protected health information subject to [HIPAA] regulations."); 75 Fed. Reg. 68,912, at 68,928 (Nov. 9, 2010) ("[Section 2000ff-5(c)] provides that the provisions of Title II of GINA are not intended to apply to uses and disclosures of health information governed by the HIPAA Privacy Rule."). It makes sense that HIPAA, not Title II of GINA, governs the lawful use of PHI within a covered health plan. Title II of GINA is, after all, an employment discrimination law, *see* 42 U.S.C. § 2000ff-1(a) (defining "unlawful employment practice[s]"). HIPAA and ERISA, by contrast, wall off employment functions from health plan administration functions and protect private health information.

The HEP complies with HIPAA. The U.S. Department of Health and Human Services

---

[22]  *See also Gallipeau v. Correct Care Sols.*, No. CIV.A. 3:10-2017-JFA, 2011 WL 4502062, at *4 (D.S.C. Aug. 5, 2011) ("[A] covered entity is not required to obtain consent or authorization to use protected health information for its own health care operations."); Ex. U (*Guidance: Treatment, Payment, & Health Care Operations*, U.S. Dep't of Health & Human Servs. (updated July 26, 2013).

has reviewed the very Program that Plaintiffs attack and found it HIPAA-compliant. *See* Ex. Q;

Penney Decl. ¶ 35. That should come as no surprise. Wellness programs offered through a health

plan are a common, lawful aspect of plan administration under HIPAA, and the HEP was

developed with close attention to those rules. It is administered by an ERISA plan—the Yale

Group Health Plan (YGHP)—that provides health benefits to Yale employees, operates

separately from Yale's employment offices, and never discloses an individual's health status to

those offices. Penney Decl. ¶¶ 28-29, 31, 41. Pursuant to a BAA, HealthMine performs

permissible plan administration functions for YGHP: monitoring YGHP's claims data in support

of a program designed to improve employee health and reduce costs. *Id.* ¶¶ 32-33. HealthMine

has no access to claims data from *outside* YGHP (e.g., data from an employee's claims before

they came to work for Yale) unless an employee reports it and provides express written

authorization for its disclosure on a Health Action Credit Form. *Id.* ¶ 37. HealthMine shares no

information on health status with Yale's employment offices: It merely tells Yale's payroll

processing system each quarter which employees should have a $25 weekly deduction, with no

further explanation or elaboration. *Id.* ¶¶ 40-41.

In short, when HealthMine monitors and analyzes claims data, it performs a plan

administration function governed by and compliant with HIPAA.[23] HealthMine is walled off

from any employment function at Yale, and HealthMine's use of claims data behind that HIPAA

wall does not amount to an unlawful acquisition or disclosure of PHI by Yale. The "claims data"

portions of Counts III and IV fail as a matter of law.

---

[23]   Plaintiffs do not allege a HIPAA violation and HIPAA provides no private right of action. *Rzayeva v. U.S.*, 492 F. Supp. 2d 60, 83 (D. Conn. 2007); *Warren Pearl Const. Corp. v. Guardian Life Ins. Co. of Am.*, 639 F. Supp. 2d 371, 377 (S.D.N.Y. 2009) (collecting cases).

### 3.    There Is No GINA Violation Based on Spousal Health Coaching.

Plaintiffs' GINA claims based on spousal health coaching fail for three independent reasons. First, Plaintiffs Kwesell and Schwartz (the only Plaintiffs that assert GINA claims) do not contend that their spouses ever underwent health coaching. Therefore, they cannot assert any GINA claim on this basis. Moreover, even if they had, the Program does not require spouses to disclose medical history during health coaching sessions. Finally, any disclosure of such history by spouses during coaching sessions is voluntary, and thus lawful under GINA. 42 U.S.C. § 2000ff-1(b)(2). Plaintiffs offer no evidence to the contrary.

It is undisputed that complying with the Program generally requires that enrollees either visit their primary care doctor and perform a short list of basic health screenings or else complete health coaching with licensed nurses as an alternative, and that certain individuals at high risk of health difficulties are also referred for three hours of nurse coaching annually. Penney Decl. ¶¶ 16-20. That is true of employees and their enrolled spouses. If a spouse refuses either to go to the doctor and do the screenings or participate in coaching as an alternative, or if the spouse is in the high-risk category and refuses to complete the nurse coaching, the employee pays a $25 weekly fee for non-compliance. *Id.* ¶ 14. From that, and nothing more, Kwesell and Schwartz claim that the Program forces spouses to "involuntarily" reveal medical histories. *See* Pls.' Mem. 16 (asserting that health coaching "necessarily include[s]" discussion of spousal medical history but citing no evidence).

That is wrong. First, Kwesell and Schwartz do not allege that their spouses ever underwent any type of health coaching or are likely to do so. Second, spouses do not have to reveal their medical histories during coaching if they do not want to. It is true that health coaching sessions are typically designed to discuss chronic health risks. Penney Decl. ¶ 21. But that does not mean that spouses have to disclose their medical histories during those sessions.

47

The coaching sessions are generally driven by the individual's goals and encourage participants to adopt healthier lifestyles. *Id.* ¶¶ 21, 44. While questions about the past come up, nothing in the record supports the claim that participants are *required* to disclose their medical histories. Plaintiffs do not even allege that Kwesell's spouse or Schwartz's spouse participated in health coaching or discussed their medical history sessions, much less that they were forced to. They satisfy their Program requirement by completing the three annual hours of coaching, not by providing specified information. *Id.* ¶¶ 44-45. There is no penalty for not volunteering information during the coaching sessions. *Id.* Employees and their spouses can complete required coaching sessions, and avoid the $25 payments, without disclosing anything they do not want to disclose. *Id.*

In short, employees do not pay $25/week because their spouses want to keep their medical histories private; they pay $25/week because their spouses do not want to participate in three hours a year of health coaching. Because Plaintiffs offer no evidence that insured spouses must divulge medical history in coaching sessions, the Court should grant summary judgment to Yale on the GINA claims attacking the coaching.

Even if Plaintiffs and their Unions had not voluntarily agreed to the Program, and even if Plaintiffs had proffered evidence that Kwesell and Schwartz's spouses had to share their medical history in coaching sessions, the $25 cost for declining to participate in coaching would not make participation in coaching sessions involuntary. The 2016 Rules made plain that employers could comply with GINA while offering incentives (including penalties) up to 30% of the health insurance premium cost for participation in a wellness program (including for spousal participation). *See supra* Section I.C. The $25 weekly charge for non-participation in the Program is an incentive equal to less than 14% of premium cost and is thus "voluntary" under the 2016 Rules. Plaintiffs do not dispute that the 2016 Rules, in effect for the 2017 and 2018

48

health plan years, permitted employers to offer a financial incentive to participate in a wellness program, including programs that entail disclosure of spousal medical histories. Pls.' Mem. 11-12. Nor do they dispute that Yale's Program complied with the 2016 Rules by keeping the incentive below 30%. ECF No. 45.

EEOC had good reason to interpret GINA to permit incentives, and though the 2016 Rules are now withdrawn, the statute should not be read to preclude reasonable incentives in 2019 or after.[24] EEOC correctly recognized that spousal medical history does *not* predict an employee's genetic information, and so falls outside the core of GINA's protections. *See* 80 Fed. Reg. 66,853, at 66,856 (Oct. 30, 2015). Disclosure of spousal medical history also carries uniquely important benefits in the context of wellness programs. If an employee voluntarily chooses to enroll a spouse in a sponsored health plan, the employer should be able to create reasonable incentives for the spouse to participate in wellness programs. *See id.* Like the ADA, GINA already requires that wellness programs be "reasonably designed" to prevent any "subterfuge for discrimination," regulations that address the risk of discrimination head-on, and have nothing to do with incentives for participation. 29 C.F.R. § 1635.8(b)(2)(i)(A); 81 Fed. Reg. 31,143, at 31,152 (May 17, 2016); *see supra* Section I.B.3. In light of the unique circumstances of spousal medical history, EEOC rightly concluded that employers may offer incentives for the disclosure of such information as part of a wellness program. 81 Fed. Reg. at 31,144. A

---

[24]   Neither the *AARP* decision nor EEOC's withdrawal retroactively nullified the 2016 Rule's application to the 2017 and 2018 plan years. *See supra* Section I.C. Nor did the EEOC's withdrawal of the rule undermine the persuasiveness of its interpretation of GINA as permitting incentives for participation in employee wellness programs. *See id*. The GINA provision regarding spousal medical history fell in the same subsection of GINA regulations that contained the 30% cap deemed invalid by the *AARP* court, 29 C.F.R. § 1635.8(b)(2)(iii), meaning that it too was withdrawn. *See* 292 F. Supp. 3d at 243; 83 Fed. Reg. 65,296 (Dec. 20, 2018). But the spousal medical history provision never conflicted with GINA: the *AARP* court was "not convinced that . . . the rule [was] unreasonable or inconsistent with GINA." 267 F. Supp. 3d at 35.

reasonable incentive for disclosure of spousal medical history to support a wellness program doesn't make such disclosure involuntary under GINA.

### 4. GINA Provides No Private Damages Action for Plaintiffs' Claims.

For the reasons above, the HEP complies with GINA. But even if it violated GINA as Plaintiffs allege, they could not bring a private damages action against Yale under GINA because they do not allege intentional discrimination.

GINA provides for remedies and enforcement at 42 U.S.C. § 2000ff-6. Under that section, damages actions against private sector employers for employment practices that allegedly violate GINA are subject to the same limitations applicable to civil rights remedies under 42 U.S.C. § 1981a ("Section 1981a"). 42 U.S.C. § 2000ff-6(a)(3). As the governing regulation states: "The following remedies are available for violations of GINA sections 202, 203, 204, 205, 206, and 207(f): (1) Compensatory and punitive damages *as provided for, and limited by*, 42 U.S.C. 1981a(a)(1) and (b) . . . ." 29 C.F.R. § 1635.10(b) (emphasis added).[25]

Section 1981a(a)(1) plainly limits damages actions to allegations of "unlawful *intentional* discrimination." 42 U.S.C. § 1981a(a)(1) (emphasis added). Section 1981a(b) sets further limits on damages beyond the "intentional discrimination" limit established by Section 1981a(a)(1). 42 U.S.C. § 1981a(b).

In short, GINA authorizes only damages actions that allege *intentional discrimination* based on genetic information. It does not authorize damages suits alleging other forms of non-compliance with GINA, such as the novel GINA claims that Plaintiffs have constructed here.

---

[25]   Plaintiffs allege violations of GINA § 202(b) (42 U.S.C. § 2000ff-1(b), regulating "request[ing], requir[ing], or purchas[ing] genetic information"),  FAC ¶¶ 116, 124, and GINA § 206 (42 U.S.C. § 2000ff-5, which governs unlawful disclosure of genetic information), *see* FAC ¶¶ 120-21, 128-29.

## <u>CONCLUSION</u>

For the reasons above, this Court should deny Plaintiffs' motion for summary judgment, grant summary judgment for Yale on the ADA claims, and either grant summary judgment for Yale on the GINA claims or dismiss those claims for lack of standing.

Respectfully submitted,

April 29, 2020

*/s/ Jonathan M. Freiman*
Jonathan M. Freiman (ct24248)
Kim E. Rinehart (ct24427)
Richard Luedeman (ct30515)
WIGGIN AND DANA LLP
One Century Tower
P.O. Box 1832
New Haven, CT 06508-1832
Tel: (203) 498-4400
Fax: (203) 782-2889
jfreiman@wiggin.com
krinehart@wiggin.com
rluedeman@wiggin.com

*Counsel for Defendant*

490\275\4810-7850-7707.v3